U.S. Department of Justice

Civil Rights Division



---

*Disability Rights Section*
*P.O. Box 66738*
*Washington, DC 20035-6738*

(8)

DJ 204-200:

Richard Wojtczak, AF5977
1100 Pike Street
Huntingdon, PA   16652-1112

Dear Mr. Wojtczak:

RE: Your Correspondence of 6/7/01

      This letter is in response to the complaint that you filed
with this office alleging a potential violation of the
Americans with Disabilities Act. Because of the large volume
of complaints that the Disability Rights Section has received
and because of our limited resources to address these
allegations, the Section will only be able to investigate your
complaint as a part of a review of the entire State prison
system.

      The prison system in which you are incarcerated is not now
currently under review by our office.  Therefore, we will take
no action on your complaint at this time.  We will maintain
your case file in an inactive status until we schedule a review
of the prison system in your State.  We cannot tell you at this
time when such a review will occur.

      We have enclosed a list of agencies in your State that
might be able to address your concerns more quickly.

                          Sincerely,

                          Dan Searing
                          Attorney
                          Disability Rights Section

*Enclosure*
*cts: 6/13/01 lg*

Mr. Donald Williamson
 Coordina~
Diagnostic Classification
Bureau of Inmate Services
Penna. Dept. of Corrections
2520 Lisburn Rd.
 P.O. Box 598
Camp Hill, Pa. 17001-0598
717-975-4859

Richard Wojtczak AF5977
1100 Pike St.
Huntingdon, Pa. 16654-1112

certificate of mailing      %c       (6)

(Cp)

Dear Mr. Williamson,

I am writing to you concerning my transfer from SCI Huntingdon, Pa., SCIH is a Level 3-4-5, maximum security facility, housing aggressive, violent, problem inmates — with all the high level security of such a hostile environment.

I am 61 years old and extremely vulnerable to these violent inmates & very hostile conditions. I am not a security risk, my behaviour and record demonstrate this, in the 26 years that I have been incarcerated I have only received "3 misconducts". Two of these "misconducts" were fighting, the one in 1995, the only one of substance, I was not guilty yet found guilty.

My record and behaviour clearly demonstrate that it is not necessary for me to be housed in a Level 3-4-5 maximum security facility, which SCIH is. This is why I wrote to you asking about minimum security level 2 facilities, I am a Level 2 minimum security inmate, I did receive your letter dated 5-14-2001, which I have attached.

In talking with my counselor here, Roger Leighty, about me being transferred to a Level 2, minimum security facility, areas come to light that are very confusing to me. Because of my confusion I write to you, to be sure that all of us are on the same page about this transfer.

Mr. Leighty told me that even though SCIH recommends I be transferred to a security Level 2 facility — the decision as to where I go is completely up to "central office", which is you. This I pretty much understand. However, Mr. Leighty also said that "central office" could transfer me to SCI Greene or some other Level 3-4-5 maximum security facility and I would have to go. This I do not understand.

What would be the point of my transfer if I am sent to just another 3-4-5 maximum security facility when SCI Huntingdon

Ef30

(where I am) is already a Level 3-4-5 Max. facility? Going from the frying pan to the fire so to speak. Being a Level 2 inmate and housed in a Level 2 facility benefits BOTH the Dept. of Corrections and the Level 2 inmate. Mr. Leighty had no answer nor explination.

I have enclosed a copy of Wojtczak V. Cuyler, 480 F. Supp. 1288 (E.D. Pa. 979) which is why I was "transfered" to SCIH 21 years ago. The threats on my life did not stop, why?, because the most violent, aggressive, sudden inmates are housed in a Level 3-4-5 maximum security facility — that's why they are Level 3-4-5 Max. inmates! These Level 3-4-5 inmates have Nothing to lose. This "Wojtczak V. Cuyler" situation ONLY occures at Level 3-4-5 Max. facilties! A Level 2 inmate, at a Level 2 facility does Not want to be "shipped" to a Level 3-4-5 facilty for causing trouble and suffer that punishment!

I was "Transfered" to SCI/Huntingdon" as a punishment, not as any inducement for good behaviour and record. The court's decision does not reveal anything that happened to me at SCI Graterford. I should never have been housed in a Level 3-4-5 Max. facilty to begin with.

The reason that I am discussing all this with you is because the inmate's told me to write to you said you are a fair and honest individual, & that I should not be afraid to be honest and fair with you.

The "Wojtczak V. Cuyler situation also explains why I must be housed in a Single Cell.

In talking with Mr. Leighty about the Four (4) Level 2 facilties in a letter dated 5-14-2001    SCI Mercer; SCI Waynesburg; SCI and Highlands and SCI Waymart. Waynesburg and Waymart are dormitory housing, that eliminates them. I can not be housed in a dormitory. That leaves Laurel Highlands and Mercer.

My first choice is Laurel Highlands, Mr. Leighty told me that I would not be transfered to Laurel Highlands, His "Explinations and reasons" I did not understand and were also confusing to me.

The only one left is SCI Mercer.

I have enclosed my request slip to Mr. Leighty dated 6-11-2001 requesting a transfer to SCI Mercer.

Mr. Williamson, I believe that I more than qualify to be transferred to a Level 2 minimum security facility.

I am requesting, respectfully, a transfer to SCI Mercer.

If not to SCI Laurel Highlands and not to SCI Mercer, then there is no point in transferring me at all, then do not transfer me.

I sincerely thank you for your understanding consideration.

Sincerely,

Richard Stojczak



# Falkner Swamp Reformed Church
## of the United Church of Christ

2077 Swamp Pike
Gilbertsville, PA 19525
(610) 323-4053

Parsonage:    2085 Swamp Pike
Gilbertsville, PA 19525
(610) 323-4424

Pastor
The Rev. Dr. Donald E. Moyer

July 9, 2001

The 2001 Consistory
Lisa Barto
Ken Berkowitz
Gennaro DeLena
Barry Hess
Brenda Hess
Donna Hoffman
Paul Kopec
Russell Miller
Doris Moser
Sue Novosel
Frank Straub
Becky Tyson

Mr. Donald Williamson
Coordinator/Diagnostic & Classification
Bureau of Inmate Services
Pennsylvania Department of Corrections
P. O. Box 598
Camp Hill, Pennsylvania    17001-0598

Dear Mr. Williamson,

It has come to my attention that you are respon-
sible for authorizing any transfer of an inmate
in the Pennsylvania State Corrections System.

I write to you on behalf of Mr. Richard Wojtczak, #AF5977, SCI
Huntingdon.  Mr. Wojtczak -- now sixty-one (61) years old -- is
classified a Level 2, Minimum Security inmate.

My appeal to you for a transfer for Mr. Wojtczak is based on my
firm belief that he should not be housed in a Level 4-5, Maximum
Security Facility such as SCI Huntingdon, with aggressive inmates
and all the high level security that accompanies such a hostile
environment.

I have known Mr. Wojtczak for approximately twenty-six (26) years,
and in all that time -- while he was incarcerated at Bucks County
Prison, at Graterford Prison, and now, at SCI Huntingdon -- Mr.
Wojtczak's behavior has demonstrated that he is not a security
risk.  To my knowledge, Mr. Wojtczak's behavior and record demon-
strates patterns of non-aggressive behavior, and he does not re-
quire constant observation by the staff.

A Level 4-5, Maximum Security Facility such as SCI Huntingdon sub-
jects Mr. Wojtczak, unnecessarily, to the limitations and condi-
tions of such a facility; a Level 2, Minimum Security Facility
does not.



Page 2



By retaining Mr. Wojtczak in a Level 4-5, Maximum Se-
curity Facility no benefits, whatsoever, can result
from such a situation.  Neither the Pennsylvania De-
partment of Corrections, nor Mr. Wojtczak, himself,
can succeed in achieving the rehabilitation goals that
are desired.  Housing Mr. Wojtczak in a Level 4-5 fa-
cility instead of a Level 2 facility defeats the re-
habilitation goal.

The current Level 4-5 situation punishes Mr. Wojtczak
for no reason instead of rewarding him for his good
behavior.  And, it is my understanding that all of the rehabilita-
tion programs of the Pennsylvania Department of Corrections have
always been designed to reward inmates for good behavior.  Good be-
havior advances rehabilitation.

Consequently, I appeal to you on behalf of Mr. Richard Wojtczak,
#AF5977, SCI Huntingdon, regarding your authorization for a timely
and humane transfer to the Level 2, Minimum Security Facility at
SRCF Mercer (SCI Mercer).

Thank you in advance for your anticipated transfer authorization
and the time and work you will undoubtedly spend dealing with this
critical situation.

Sincerely,

Donald E Moyer

The Reverend Dr. Donald E. Moyer      Spiritual Advisor to...
2085 Swamp Pike                          Mr. Richard Wojtczak, #AF5977
Gilbertsville, PA    19525               SCI Huntingdon


cc:    Mr. Jeffrey A. Beard, Ph. D.
       Executive Deputy Secretary
       Pennsylvania Department of Corrections
       P. O. Box 598
       Camp Hill, PA    17001-0598

       Mr. Kenneth D. Kyler, Superintendent
       SCI Huntingdon
       1100 Pike Street
       Huntingdon, PA    16652

       Mr. Scott Walters              Mr. Roger Leighty, Counselor
       Unit Manager, BA Unit          SCI Huntingdon
       SCI Huntingdon                 1100 Pike Street
       1100 Pike Street               Huntingdon, PA    16652
       Huntingdon, PA    16652

               Mr. Tom Gembinski, Clinic
               SCI Huntingdon
               1100 Pike Street
               Huntingdon, PA    16652



8-14-01 pw (6)

**PENNSYLVANIA DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PENNSYLVANIA 17001-0598**
**(717) 975-4859**

August 9, 2001

Richard Wojtczak, AF-5977
SCI Huntingdon

Dear Mr. Wojtczak:

I am again responding to your custody level and transfer concerns. You question your housing at SCI Huntingdon as a minimum-security inmate.

The Department does not have sufficient CL-2 facilities to handle the percentage of CL-2 cases in our custody. As a custody level 2 case you have more privileges than CL-3 or CL-4 cases.

Each institution and housing unit has been determined to handle specific custody level inmates. Depending upon an inmate's custody level we aim to match their custody level to the housing security level.

As you are many years beyond your minimum parole date, you need to determine from the Parole Board what programs are necessary to help you make parole.

In regard to your requested transfer to a minimum security facility, you need to work with the Huntingdon staff to determine your eligibility, as any transfer recommendations on your behalf must come from them.

My office is unable to offer further assistance without a recommendation from the Huntingdon staff.

Sincerely,

Donald Williamson
Coordinator/Diagnostic & Classification
Bureau of Inmate Services

DW/jk
cc:    Supt.   Kyler (HUN)
       File



Richard Trojcak AF5977
1100 Pike St.
C/c    Huntingdon, Pa 16654-1112
S.C.i. Huntingdon        C/c    (6)

8-29-2001 -- approx. 4⁰⁰ PM. While I was sitting in the center waiting to take
my shower in the ATA room, Scott Walters, Unit Manager BA Unit,
came over to talk to me. He returned to me my request slip dated
8-27-01 requesting to move me to another Cell.

He told me that I have been approved to be TRANSFERRED to
S.C.i. Laurel/Highlands in approx 1 to 3 MONTHS from now. He
said he wanted to save me from moving all my property to another
cell and I am going to be TRANSFERRED anyway.

I asked him WHEN ALL this happened? Walters said, that beds have
become available at SCi Laurel/Highlands due to renovations, so
me and 5 other inmates will be TRANSFERRED there. Walters had talked to
Medical dept. here and Medical Services at Doc Camp/Hill, ALSO
TALKED with Tom GEMBINSKi last week!

        Walters also said that this approval had
    taken place in the last 10 MINUTES ago!
Walters also said that I would have a SINGLE CELL at
SCi Laurel/Highlands (z status would NOT CHANGE).
Walters said that I could take 1 FOOTLOCKER PLUS 2 FILE CARTONS on
TRANSFER, anything over I can send to SCi Laurel/Highlands.        X see 9-10-01
        I don't believe a word Walters has "said"!!        11-19-01
                                                            11-28-01

Now I have to be sure my money on inmate accounts goes with me ALSO
    that SCi Laurel/Highlands knows I am a SINGLE CELL, otherwise
there are going to be arguments at Laurel/Highlands when I get there!

EX 33



# Falkner Swamp Reformed Church
## of the United Church of Christ

2077 Swamp Pike
Gilbertsville, PA  19525
(610) 323-4053

Parsonage:       2085 Swamp Pike
Gilbertsville, PA  19525
(610) 323-4424

· Pastor
The Rev. Dr. Donald E. Moyer

August 29, 2001

The 2001 Consistory
Lisa Barto
Ken Berkowitz
Gennaro DeLena
Barry Hess
Brenda Hess
Donna Hoffman
Paul Kopec
Russell Miller
Doris Moser
Sue Novosel
Frank Straub
Becky Tyson

The Honorable John Barley, Chairperson
Appropriations Committee
Pennsylvania House of Representatives
1000A   Millersville Road
Lancaster, PA   17603

Dear Congressman Barley,

    The attached letter is a copy of a letter I
recently sent to Mr. Donald Williamson of the
Pennsylvania Department of Corrections.

The letter pertains to a "Request for Transfer" by Mr. Richard
Wojtczak, #AF5977, SCI Huntingdon.

I believe that some of the issues I raised in my letter to Mr.
Williamson are issues you as Chairperson of the Appropriations Com-
mittee would be interested in addressing.   I would certainly welcome
any response from you regarding this critical matter which deeply
affects Mr. Wojtczak.

Thank you for your attention and response.

Sincerely,

Reverend Dr. Donald E. Moyer, Pastor
Spiritual Advisor to... Mr. Richard Wojtczak, #AF5977
                SCI Huntingdon



# Falkner Swamp Reformed Church
## of the United Church of Christ

2077 Swamp Pike
Gilbertsville, PA  19525
(610) 323-4053

Parsonage:  2085 Swamp Pike
Gilbertsville, PA  19525
(610) 323-4424

Pastor
The Rev. Dr. Donald E. Moyer

August 29, 2001

The 2001 Consistory

Lisa Barto
Ken Berkowitz
Gennaro DeLena
Barry Hess
Brenda Hess
Donna Hoffman
Paul Kopec
Russell Miller
Doris Moser
Sue Novosel
Frank Straub
Becky Tyson

The Honorable Richard A. Tilghman, Chairperson
Senate Appropriations Committee
406 Gatcombe Lane
Bryn Mawr, PA    19010

Dear Senator Tilgham,

The attached letter is a copy of a letter I
recently sent to Mr. Donald Williamson of the
Pennsylvania Department of Corrections.

The letter pertains to a "Request for Transfer" by Mr. Richard
Wojtczak, #AF5977, SCI Huntingdon.

I believe that some of the issues I raised in my letter to Mr.
Williamson are issues you as Chairperson of the Senate Appropria-
tions Committee would be interested in addressing.  I would certainly
welcome any response from you regarding this critical matter which
deeply affects Mr. Wojtczak.

Thank you for your attention and response.

Sincerely,

Donald E. Moyer

Reverend Dr. Donald E. Moyer, Pastor
Spiritual Advisor to... Mr. Richard Wojtczak, #AF5977
SCI Huntingdon



# Falkner Swamp Reformed Church
## of the United Church of Christ

2077 Swamp Pike
Gilbertsville, PA  19525
(610) 323-4053

Parsonage:    2085 Swamp Pike
Gilbertsville, PA  19525
(610) 323-4424

**Pastor**
The Rev. Dr. Donald E. Moyer

August 29, 2001

**The 2001 Consistory**
Lisa Barto
Ken Berkowitz
Gennaro DeLena
Barry Hess
Brenda Hess
Donna Hoffman
Paul Kopec
Russell Miller
Doris Moser
Sue Novosel
Frank Straub
Becky Tyson

The Honorable Stewart Greenleaf, Chairperson
Senate Judiciary Committee
27 N. York Road
Willow Grove, PA   19090-3419

Dear Senator Greenleaf,

The attached letter is a copy of a letter I
recently sent to Mr. Donald Williamson of the
Pennsylvania Department of Corrections.

The letter pertains to a "Request for Transfer" by Mr. Richard
Wojtczak, #AF5977, SCI Huntingdon.

I believe that some of the issues I raised in my letter to Mr.
Williamson are issues you as Chairperson of the Judiciary Committee
would be interested in addressing.  I would certainly welcome any
response from you regarding this critical matter which deeply affects
Mr. Wojtczak.

Thank you for your attention and response.

Sincerely,

*Donald E. Moyer*

Reverend Dr. Donald E. Moyer, Pastor
Spiritual Advisor to... Mr. Richard Wojtczak, #AF5977
                    SCI Huntingdon

Ef 36



# Falkner Swamp Reformed Church
## of the United Church of Christ

2077 Swamp Pike
Gilbertsville, PA  19525
(610) 323-4053

Parsonage:      2085 Swamp Pike
Gilbertsville, PA  19525
(610) 323-4424

Pastor
The Rev. Dr. Donald E. Moyer

August 29, 2001

The 2001 Consistory
Lisa Barto
Ken Berkowitz
Gennaro DeLena
Barry Hess
Brenda Hess
Donna Hoffman
Paul Kopec
Russell Miller
Doris Moser
Sue Novosel
Frank Straub
Becky Tyson

The Honorable Thomas Gannon, Chairperson
Judiciary Committee
Pennsylvania House of Representatives
310 Amosland Road
Holmes, PA   19043

Dear Congressman Gannon,

The attached letter is a copy of a letter I
recently sent to Mr. Donald Williamson of the
Pennsylvania Department of Corrections.

The letter pertains to a "Request for Transfer" by Mr. Richard
Wojtczak, #AF5977, SCI Huntingdon.

I believe that some of the issues I raised in my letter to Mr.
Williamson are issues you as Chairperson of the Judiciary Committee
would be interested in addressing.  I would certainly welcome any
response from you regarding this critical matter which deeply affects
Mr. Wojtczak.

Thank you for your attention and response.

Sincerely,

Reverend Dr. Donald E. Moyer, Pastor
Spiritual Advisor to... Mr. Richard Wojtczak, #AF5977
SCI Huntingdon






**PENNSYLVANIA DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PENNSYLVANIA 17001-0598**
**(717) 975-4859**

September 10, 2001

Rev. Dr. Donald Moyer
2085 Swamp Pike
Gilbertsville, PA 19525

Re:    Richard Wojtczak, AF-5977

Dear Rev. Moyer:

I am responding to your recent letter in which you are requesting clarification of several issues that were discussed in my prior letter of July 20, 2001 to Richard Wojtczak.

In regard to my comment that the Department has insufficient cell space for custody level 2 cases at our custody level 2 facilities, that comment is still true. However, we do have sufficient custody level 2 housing at our custody level 3 or 4 facilities to successfully handle our entire custody level 2 population. As many of our facilities can handle multiple custody levels, this has not been a problem as you indicate.

In addition, you are extremely critical of our Laurel Highlands facility and its ability to care for our elderly and disabled inmate population. Had you been aware that Laurel Highlands is still undergoing renovations to expand its capacity, you would know that additional personal and critical care services will be provided at that facility.

In regard to your comment about higher custody level cases being housed at CL-2 facilities, the Department does house a few inmates at these institutions. The rationale for their placement is based upon psychological, medical, protection and special needs housing.

Hopefully this information will clarify many of your concerns for the operation of our Department.

Sincerely,

Donald Williamson
Coordinator/Diagnostic & Classification
Bureau of Inmate Services

DW/jk

cc:    Deputy Secretary Love
       Supt.  Kyler (HUN)
       File

(3)

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

Commonwealth of Pennsylvania
Department of Corrections

*C/C*

INSTRUCTIONS
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

S. Walters - Unit Manager BA unit

1. To: (Name and Title of Officer)

2. Date: 9-10-2001

3. By: (Print Inmate Name and Number)
RICHARD WOJTCZAK AF5977
*Richard Wojtczak*
Inmate Signature

4. Counselor's Name   Leidy

5. Unit Manager's Name   Walters

6. Work Assignment
medically unable to work

7. Housing Assignment
BA 1040 cell

8. Subject: State your request completely but briefly. Give details.
RE: My transfer to SCI Laurel/Highlands approved

As per our conversation on 8-29-01 my Transfer to SCI Laurel/Highlands has been approved. In order that I do not have any arguments leaving SCI Huntingdon AND No arguments when I arrive at SCI Laurel/Highlands — there are a couple of things I ask you to do Prior to me leaving SCI Huntingdon ——

1. Please notify SCI Laurel/Highlands that I do have SINGLE Cell STATUS ——
2. Please make sure my money on my inmate account at SCI Huntingdon goes with me to SCI Laurel/Highlands upon transfer ——
3. That I am permitted to take a footlocker AND 2 file cartons for my personal property on my transfer to SCI Laurel/Highlands — Also any addition of property (if any) can Mail to SCI Laurel/Highlands — I Need address of SCI Laurel/Highlands

Also: On what date would I classify as a Level 2 inmate?   *Thank you*

9. Response: (This Section for Staff Response Only)

No response from Walters

See
8-29-01
11-19-01
11-28-01

To DC-14 CAR only ☐

To DC-14 CAR and DC-15 IRS ☐

Staff Member Name _____ / _____ Date _____
                        Print                      Sign

Revised July 2000

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

*witnessed!*

S. Walters – unit manager BA

1. To: (Name and Title of Officer)

3. By: (Print Inmate Name and Number)

RICHARD WOJTCZAK AF5977

*Richard Wojtczak*
_Inmate Signature_

6. Work Assignment

*medically unable to work*

Commonwealth of Pennsylvania
Department of Corrections

C/C

**INSTRUCTIONS**
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

2. Date: 10-2-01    10-2-01 pw

4. Counselor's Name Leidy

5. Unit Manager's Name Walters

7. Housing Assignment BA 1040 cell

8. Subject: State your request completely but briefly. Give details.

What reasonable accommodations have been made, because of my disability, for me to go, to and from:

Church - Chapel ; Eye Doctor SciH ; law library ; Mental Health Clinic ; inmate Barber shop ; inmate Commissary ; Dentist ; Showers _ _ _ _ _

Without sending me to SCi Smithfield, "inpatient - infirmary" which is the HCLE.

Now you have them in writing!!

Thank you.

DC-ADM006

C/C

/C Capt. K KELLER Dpt SciH • Jeffrey Beard Sct. Pa Doc

9. Response: (This Section for Staff Response Only)

No response from Walters

To DC-14 CAR only ☐

To DC-14 CAR and DC-15 IRS ☐

EY40

Staff Member Name _____ / _____ Date _____
Print                          Sign

Revised July 2000

| Form DC-135A | *returned!* | Commonwealth of Pennsylvania<br>Department of Corrections |
|---|---|---|
| **INMATE'S REQUEST TO STAFF MEMBER** | *C/C* | **INSTRUCTIONS**<br>Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |

1. To: (Name and Title of Officer)
S. Walters – unit manager BA

2. Date: 10-20-01    10-2-01 PW

3. By: (Print Inmate Name and Number)
RICHARD WOJTCZAK AF5977
*Richard Wojtczak*
Inmate Signature

4. Counselor's Name
Leidy

5. Unit Manager's Name
Walters

6. Work Assignment
medically unable to work

7. Housing Assignment
BA 1040 cell Q

8. Subject: State your request completely but briefly. Give details.

What reasonable accommodations have been made, because of my disabilites, for me to go, to and from:

Church-Chapel ; Eye Doctor SciH ; law library ; Mental Health Clinic ; inmate Barber shop ; inmate Commissary ; Dentist ; Showers - - - - -

Without sending me to SCi Smithfield , Inpatient-infirmary which is the HolE.

Now you have they in writing !!    DC-ADM006

Thank you.

C/C
C/c Capt K Kyler Supt SciH ; Jeffrey Beard Sect. Pa Doc

9. Response: (This Section for Staff Response Only)

No response from Walters !

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ | Exh 41 |

Staff Member Name _____ / _____ Date _____
Print                    Sign

Revised July 2000

Richard Frjtzyak AF5977
S2:H

Thursday
10-11-01, 12 P.m — I was going to the barber shop, Scott Walters stopped
me and said he had called Laurel Highlands — They do have
SINGLE CELLS there, also they SHOULD have no difficulty in accommodating
my single cell. That I SHOULD have a SINGLE cell.

I told Walters, what bothers me is the word SHOULD. Walters said
that he does not run their jail. I asked him who the Superintendent
was at Laurel Highlands, Walters said he didn't know — for me to
write him a request slip and he will get name of Superintendent and
address of Laurel Highlands.

I forgot to ask him who he talked to at Laurel Highlands.
I STILL have NOT received an Answer, Yes or NO —
Do I have a SINGLE cell at Laurel Highlands ??
On 8-29-01 Walters told me that I would have a SINGLE cell at
Laurel Highlands — However since then it has been Vague (verbally)
no — Yes or No! There has been No official answer in Writing!!
Based on 'past responses', I still don't believe Walters!
I will get the name of the Superintendent at Laurel Highlands and
write and ask for myself!!

E742

*lee* 
*10-20-01 pw*

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
2520 LISBURN ROAD, P.O. BOX 598
CAMP HILL, PA 17001-0598


*(15)*

THE SECRETARY'S OFFICE OF
INMATE GRIEVANCES AND APPEALS

October 12, 2001

Richard Wojczak, AF-5977
SCI-Huntingdon

Re:   DC-ADM 804 – Final Review
Grievance No. 498

Dear Mr. Wojczak:

This is to acknowledge receipt of your appeal to final review of the above numbered grievance.

In accordance with the provisions of DC-ADM 804, effective January 1, 2001, I have reviewed the entire record of this grievance; including your initial grievance, the grievance officer's response, your appeal from initial review and the superintendent's response. I *(1)* have also carefully reviewed the issues you raise to final review.

Upon completion of this review, it is the decision of this office to uphold the responses provided by staff at the institutional level. I have confirmed that the facility's request for a transfer for medical reasons to SCI-Laurel Highlands is pending review. *XX* Moreover, there is no requirement for the staff to recommend transfer for an inmate simply because he is classified as a Custody Level 2. I also find no support for your argument that the STEP program you completed nearly five years ago has any bearing on your decision to be non-compliant with your prescriptive program plan that is reviewed with you annually.

The responses provided at the institutional level are appropriate and in accordance with Department of Corrections policies and procedures. Accordingly, your appeal to final review must be denied.

Sincerely,

Thomas L. James
Chief Grievance Coordinator

TLJ:rh

cc:   Superintendent Kyler
       Grievance Office
       Central File

*Ex 43*

"Our mission is to protect the public by confining persons committed to our custody in safe secure facilities, and to provide opportunities to inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims."

(4)

## PASS SYSTEM

Any inmate moving from one part of the institution to another must have a signed pass in his/her possession. The only exception is group movement such as meals, recreation, work lines, etc. You are expected to use the shortest approved route from point to point. Deviation from the shortest route may be construed as presence in an unauthorized area.

The pass must be signed by a staff member at both the issuing and receiving end of the movement.

## PRE-RELEASE

Pre-release includes: Work and Educational or Vocational Training Release, Temporary Home Furloughs, and Community Corrections. Detailed information is provided to you in DC-ADM 805 Administrative Directive entitled Policy and Procedures for Obtaining Pre-Release Transfer.

## PRESCRIPTIVE PROGRAM PLAN

Various counseling, psychological and other types of treatment services are available. Each inmate will participate in the completion of a Prescriptive Program Plan which outlines various areas you should work on while incarcerated. Your counselor will meet with you periodically to review your Prescriptive Program Plan and will advise you as to how to involve yourself in recommended programs and services. The adherence to the Prescriptive Program Plan is important as it will be used by staff when considering you for program advances, special programs and parole.

## PRIVATE BUSINESSES

<u>POLICY</u>

No inmate is permitted to incorporate or engage actively in a business or profession while under the supervision of the Department of Corrections except as indicated below. An inmate who has engaged in a business or profession prior to incarceration is expected to assign authority for the operation of such business or profession to a person in the community.

A.    EXCEPTIONS

Even though an inmate has turned over the operation of a business or profession to another person, there may be an occasional need for a decision substantially affecting the assets or prospects of the business. The Superintendent may, upon request from the inmate, authorize a special visit for such extraordinary occasions.

The general prohibition of conducting a business by an inmate has certain exceptions.

1.   Inmates who are unsentenced may continue to control their business or profession as long as it does not place undue burden on the institution.

2.   Inmates in Work Release programs may engage in private businesses or professions as part of their Work Release Program providing such activity does not place undue burden on the institution.

3.   Inmates in Community Corrections may engage in private businesses or professions as part of their community based program.

*This is inmate handbook (rules-regulations) Prescriptive Program Plan (PPP) Does Not apply + TRANSFERS! PPP ONLY applies to 'some sort of Release program' ie PAROLE!*

Mr. Fredric Rosemeyer                              10-16-01
Superintendent
SCI, Laurel Highlands                    Richard Wojteczak AF5977
5706 Glades Pike                         1100 Pike St.
Somerset, Pa. 15501-0631                 Huntingdon, Pa. 16654-1112
                                         certificate of Mailing    C/c
                                                                    (8)

I am writing to you concerning my imminent transfer to SCI Laurel/Highlands.

The reason I am now writing to you is because I have really tried 'to work with/Huntingdon staff', which has proven to be a complete exercise in futility.

I have corresponded with Donald Williamson, Bureau of Inmate Services, at the Pa. Dept of Corrections. Mr. Williamson has not given me too much information, he basically tells me 'to work with the staff at SCIH (which I have tried to do, without success).

Although my transfer request dates back to December 2000, I will make the story brief.

I have been classified by the DOC-SCIH as a Level 2, minimum security inmate. Despite the facts that — I demonstrate pattern of Non-aggressive behavior — and my behavior and record shows that I only require intermittent direct observation by staff — I am housed in a Maximum security facility and I am treated like a Maximum security inmate! I Do NOT have 'more privileges' than Level 3-4, maximum security inmates (see Williamson's letters to me dated May 14, 2001; August 9, 2001, attached).

Mr. Williamson informs me (his letter dated May 14, 2001) that there are Only four (4) Level 2, minimum security facilities within the Pa. Dept of Corrections --- Mercer, Waynesburg, Laurel/Highlands, Waymart. Early on, Waynesburg and Waymart were eliminated because of Dormitory - Cubicle housing. That left Mercer and Laurel/Highlands.

I MUST be housed in a SINGLE CELL
(no inmate in cell with me) - see Wojteczak V.
Cuyler, 480 F. Supp. 1288 (E.D. Pa 1979) attached.

Another factor which is in the mix, I have degenerating bone disease Knees, Hips, disc in spine. It is extremely painful for me to walk long distances, even with a cane. Also, I can Not stand for any length ①

of time. There is No "cure for this disease, Nothing can be done, this disease only gets worse.

S.C.I.H. has refused to transfer me to sci Mercer, that leaves sci Laurel/Highlands.

I have absolutely No problem being Transfered to Laurel/Highlands, However, I MUST be housed in a SINGLE CELL.

This is the reason I write you (SINGLE CELL).

I have told Roger Leidy, my counselor and Scott Walters, unit manager here at S.C.I.H., that I will go to Laurel/Highlands (No problem) but I MUST have a SINGLE CELL. I receive No responses - answers to my request slips. The Verbal "responses" I get are - "they don't run Laurel/Highlands" AND I "SHOULD get a SINGLE CELL at Laurel Highlands". I told Scott Walters that the word "SHOULD" bothers me! I do NoT want any arguments (get off on the wrong foot at Laurel/Highlands) when I get there. Also, I do NoT want any arguments about the money on my inmate account getting to Laurel /Highlands. I don't want to be waiting for my money to arrive.

This is why I am attempting to take care of these issues Long Before my Transfer! Plenty of time to resolve these issues!

I told Scott Walters that I really don't understand Why I can Not get a Straight Answer.

Do I have a SINGLE CELL at Laurel/Highlands?

Yes I do! No I don't! Very simple to answer! This is NoT "brain surgery!

Mr Rosemyrg, this is as brief as I can make a year long story. You now see why I write you directly.

Will I have a SINGLE CELL at Sci Laurel/Highlands?

②

I have also enclosed my letter to Secretary Jeffery A. Beard Ph.D.,
Pa. Dept of Corrections dated 10-3-01, with the attached documents.
This letter may fill in any blanks for you.

Sincerely,

Leila Grzybowski

P.S.

I will NOT receive the threats and attempts on my life at a
Level 2 Minimum security facility (Laurel/Highlands). Level 2 inmates
have too much to lose (transfer to a Maximum security facility etc.)
Whereas, Level 3-4 maximum security inmate have nothing to lose!

③

TRANSFER PAC''T (and SINGLE Cell)

10-23-01

Richard Dotzryok AF5977
SCi Huntingdon, Pa.    C/C

VOTE:

(10)

2-29-01  Scott Walters, unit manager, tells me ... my TRANSFER to
SCi Laurel Highlands HAS BEEN APPROVED

9-6-01  Superintendent K. Kyler, SCi Huntingdon in Grievance #498 tells
me ... you have BEEN APPROVED for a medical transfer
to SCi Laurel Highlands

9-6-01  Superintendent's assistant, Diana S. Baney (Grievance #498) tells
me ... you have BEEN APPROVED for a medical TRANSFER
(SCi Laurel Highlands)

10-12-01  Thomas L. James
Chief Grievance Coordinator, Pa. Doc, (Grievance #498) tells me
"I have confirmed that the facility's request for a TRANSFER for
medical reasons to SCi Laurel Highlands IS PENDING REVIEW."

My TRANSFER 'HAS BEEN APPROVED'  is Very Different
'than' My request for TRANSFER 'is PENDING REVIEW'

Which is it 'APPROVED' OR 'PENDING REVIEW'   it can't be BOTH!

10-22-01  Nurse Supervisor, Patty Overholt ... 'Currently you are still on the list
for personal care needs at a different facility'
(I am ONLY on the list ... for a different facility = NOT APPROVED?)

①  'SO'  I am a Level 2, Minimum Security inmate, Why am I treated like a
Maximum Security inmate ??

②  Level 2, minimum security inmates HAVE MORE PRIVLEGES" than maximum
Security inmates  What are the "MORE PRIVLEGES ??

ABSOLUTELY NO ONE has answered these 2 questions! Why?

Ef46

TRANSFER PACKET (and SINGLE CELL)          10-26-2001

Richard Wojtyczk AF5977
sci Huntingdon, Pa.          c/c
                                              (10

SINGLE CELL on TRANSFER

never not housed in cell with me — single cell in Z STATUS

I MUST be housed in a SINGLE CELL no matter which facility I am in

See   Wojtyczk v. Coyle, 480 F.Supp. 1288 (C.D. Pa. 1979).

5-19-2001, my request slip to Roger Leidy, my counselor, give me all info on the 4 Level 2 facilities
          from Donald Wilkinson   NO RESPONSE

7-6-01  my letter to Donald Williams   NO RESPONSE ON SINGLE CELL

8-9-2001 letter from Donald Williams   NO RESPONSE on SINGLE CELL?

8-18-2001 my request slip to R. Leidy   NO RESPONSE on SINGLE CELL?

8-27-2001 my request slip to R. Leidy   NO RESPONSE, SINGLE CELL

8-29-2001 Scott Watters, unit manager   I will have SINGLE CELL at sci Laurel/Highlands

9-10-2001 my request slip to Scott Watters on SINGLE CELL   NO RESPONSE

10-1-2001 my request slip to Scott Watters on SINGLE CELL   NO RESPONSE

10-1-2001 my request slip to Scott Watters on SINGLE CELL   DOES NOT ANSWER MY QUESTION
he says "Z status inmates can be housed in a DORMITORY SETTING, according to
DOC policy. You will retain your Z status. Remember you requested this
TRANSFER. We have that in writing." (but see Wilkinson letter 8-9-01 above).

10-3-2001 my letter to Jeffrey A. Beard Ph.D., Secretary Pa. DOC. on SINGLE CELL   NO RESPONSE

10-11-2001 Scott Watters tells me "that I SHOULD have SINGLE CELL at Laurel/Highlands"

10-16-2001 my letter to Fredric Rosemeyer, Superintendent sci Laurel/Highlands on SINGLE CELL
          NO RESPONSE

NOTHING in WRITING on SINGLE CELL   WHY??

ALSO ① I am a Level 2, minimum security inmate, Why am I treated like a
          ② Maximum security inmate ??
          Level 2, minimum security inmates HAVE "MORE PRIVILEGES" than
          Maximum security inmates   What are the "MORE PRIVILEGES" ??

ABSOLUTELY NO ONE has answered these 2 questions / Why ??

Ef
41

1-10-02, 2:15 PM

Richard Wojtyak AF5977
SCI H,
(6)

Scott Walters came to my cell, asked me why I had to shower in ATA room shower. He said they installed hand rails in regular population shower on cell block. — he asked why I couldn't shower in block shower — I have COPD, emphysema, shortness of breath, floor is too slippery — too much steam, I get extremely dizzy

He said they "may" shut down ATA room showers!!

So it will be shower in block shower OR NOTHING!!

I have been showering in infirmary showers (ATA room showers) —
For Years!

I asked Walters when I will be Transferred? / He didn't know! / He said I had a date to go to SCI Laurel Highlands Aug. 2001, "but they took someone else"! I said I was suppose to be Transferred the beginning of 2001 (March-April?) And I didn't go then either! Walters didn't say anything else!!

What good is being on "the List" to be Transferred to SCI Laurel/Highlands when I am Passed Over???

My Transfer inmates who are ONLY "hard of hearing" to SCI, Laurel/Highland!!!
(I know of at least ONE)

-21-02 4:15 PM the chair that I need to sit on when I dry off after I shower in the ATA room shower is MISSING!! [1-23-02 Stole Petty Crooks!!]

EC 48

1-22-02

Ms. Joan Trees
Corr. Hlth. Care Administrator
Pa. Dept. of Corrections
Bureau of Health Care
Central Office
520 Lisburn Rd.
P.O. Box 598
Camp / Hill Pa. 17001-0598

Richard Wojtyzak AF-5977
SCI Huntingdon
1100 Pike St.
Huntingdon Pa. 16654-1112
c/c       (4)

Dear Ms. Trees,

I have a chronic, incurable, degenerating bone disease in both knees, hips, disc in spine (among other medical problems). It is extremely painful for me to walk (even with a cane), or stand, I can not walk up and down stairs.

S.C.I. Huntingdon has made no "reasonable accommodations" for me because of my disabilities (ADA of 1990 - RA of 1973).

I have also been classified as a Level 2, minimum security inmate, yet I am housed in a maximum security facility AND treated like a maximum security inmate. My requests for a Transfer to a more suitable facility, SCI Laurel/Highlands, have been met with tremendous resistance and vague responses by the staff here at SCI/Huntingdon.

The staff have kept telling me that I am on the "LIST" to be transferred to SCI Laurel/Highlands. However, I have been PASSED OVER TWICE for this transfer (March-April 2001 - August 2001). I have asked, but given no reason/reasons why I have been PASSED OVER, I was told to write to you and you would answer my questions.

1. What is the reason/persons I have been PASSED OVER TWICE for a Transfer to SCI Laurel/Highlands?

2. Who is the person/persons who authorized my being PASSED OVER for a Transfer to SCI Laurel/Highlands?

3. What good is it for me to be on the "LIST" for Transfer to SCI Laurel/Highlands just for me to be PASSED OVER TWICE for transfer?

4. What good is the "LIST"?

Sincerely,

Richard Wojtyzak

49

Ordered byDr. _PAC Mils_     Nurse: _yw_     _Rec'd 1-28-02 pw_

Name: _Wojteck, Richard_     D.C. No: _AF5977_

Date of birth: _____     Block: _B_

Frequency: _____     Date Due: _____

                          Date started _1-28-02_
Condition[s] to be followed:     Date discontinued _7-28-02_

_____

_____

Type of follow-up care: _Meds AT Infirmary_     _can't walk long distances_

     _X  1.80  days_

# 2002

| JANUARY | APRIL | JULY | OCTOBER |
|---|---|---|---|

| FEBRUARY | MAY | AUGUST | NOVEMBER |
|---|---|---|---|

| MARCH | JUNE | SEPTEMBER | DECEMBER |
|---|---|---|---|

_EF 50_



# Falkner Swamp Reformed Church
## of the United Church of Christ

2077 Swamp Pike
Gilbertsville, PA  19525
(610) 323-4053

Parsonage:      2085 Swamp Pike
Gilbertsville, PA  19525
(610) 323-4424

**Pastor**
The Rev. Dr. Donald E. Moyer

**The 2002 Consistory**
Lisa Barto
Ken Berkowitz
Gennaro DeLena
Gerald Fizz
Lee Heffner
Brenda Hess
Donna Hoffman
Paul Kopec
Russell Miller
Sue Novosel
Linda Rennard
Becky Tyson

January 14, 2002

The Honorable Governor Mark Schweiker
225 Capitol Building
Harrisburg, Pennsylvania    17120

Dear Governor Schweiker,

I write this letter to you in order to seek your assistance, as well as to obtain some answers to various disturbing questions which directly affect your administration in Harrisburg as it relates to the Pennsylvania Department of Corrections.

For more than twenty-six years, I have known Mr. Richard Wojtczak, #AF5977, SCI Huntingdon.  For most of that time, I have been serving as Mr. Wojtczak's "Spiritual Advisor."  Consequently, I contact you with serious concerns affecting an individual with whom I am very familiar.

For almost the past year, Mr. Wojtczak has been petitioning SCI Huntingdon for a transfer to another facility that is much more suited to his particular medical condition, as well as his official classification.  Mr. Wojtczak suffers from advanced diabetes and bone degeneration (the two most serious conditions among other medical problems).  He is also officially classified as a Level 2 Minimum Security inmate, although he is incarcerated in a Maximum Security facility.

Mr. Wojtczak's requests for transfer to a more suitable facility, namely SCI Laurel Highlands, has met with tremendous resistance and vague responses by the staff of SCI Huntingdon, as well as Secretary Beard (Secretary of the Pennsylvania Department of Corrections).

In the meantime, Mr. Wojtczak continues to be treated like a maximum security inmate, although he is continually told that he has "more privileges" as a Level 2 Minimum Security inmate.  The fact is, Mr. Wojtczak experiences no such privileges, and his medical

Page 2

condition continues to worsen!

Turning to another serious issue affecting Mr. Wojtczak....
Pennsylvania Department of Corrections / SCI Huntingdon
is not in compliance with the "Americans with Disabilities
Act of 1990," as well as the "Rehabilitation Act of 1973."
The Pennsylvania Department of Corrections has not been in
compliance with the "Americans with Disabilities Act"
since 1992. The Pennsylvania Department of Corrections
has also not been in compliance with the "Rehabilitation Act" since
1977. In addition, the Pennsylvania Department of Corrections's
own "policy" on disabled inmates (ADA) DC-ADM006 has not been in
compliance since 1999!

In spite of this deplorable situation, the Pennsylvania Department
of Corrections / SCI Huntingdon has accepted Federal Financial
Assistance (federal funding) since 1977; this violates Federal Law!

Another serious situation affecting Mr. Wojtczak is the ongoing un-
professional conduct of Co. R. McCall at SCI Huntingdon. Numerous
appeals and requests by Mr. Wojtczak have fallen on deaf ears. In
the process, Mr. Wojtczak is penalized and reprimanded due to erro-
neous "misconducts" by Co. McCall. The entire situation demon-
strates a lack of professional training on Co. McCall's part. Ad-
ding to this harmful situation is the fact that the Pennsylvania
Department of Corrections / SCI Huntingdon staff, supervisors, and
administrators accept, support, and condone this unprofessional
conduct of Co. McCall!

I re-emphasize my dire need for your assistance as Governor. Lit-
tle, if any, assistance has been forth-coming from any Pennsylvania
Department of Corrections's official or staff, supervisor, or admin-
istrator at SCI Huntingdon regarding...

> the lack of any real, beneficial medical treatment for
  Mr. Wojtczak;

> the lack of concern whatsoever for inmates with dis-
  abilities;

> the psychotic behavior of staff/guards at SCI Huntingdon;

> the lack of any meaningful review of inmate or facility
  classifications;

> requests for transfers of inmates as to minimum/maximum
  security (inmates requests are not taken seriously and
  inmates are meerly told things to keep them "in line");

> the prevention of fabricated "misconducts" and their
  "rubber stamping" by other staff.

For you, as Governor, this situation can only cast a poor reflect-
ion on you as Govenor and your administration. Although Mr. Wojt-
czak and the other inmates have been "convicted of crimes," they



are still human beings, and should be treated as human
beings!

As I value and appreciate your patient dealing with this
communication, I must still bring one, final serious is-
sue to your attention.  As a citizen of the Commonwealth
of Pennsylvania, and as a taxpayer, I appeal to your
accountability as Governor of the Commonwealth....

....In Williams v. Syed, 782A2d 1090 (Pa. Cmwlth. 2001) pages 1094-
1095, they cite Wareham v. Jeffes, 129 Pa. Cmwlth 124, 564A2d 1314
(1989).  Both cases were decided in the Commonwealth Court of Penn-
sylvania!  Williams sued for "incompetent" medical services at SCI
Pittsburgh.  Of particular interest is the fact that Damien Williams
was transferred to SCI Huntingdon.  Yet, SCI Huntingdon did nothing
for Mr. Williams.  Subsequently, Mr. Williams was transferred to
SCI Green, July 5, 2000.  --  Mr. Williams is asking $50,000.00 in
damages at page 1093!

In the Wareham v. Jeffes case at pages 1094-1095 of Williams v.
Syed case, Wareham sued SCI Pittsburgh for "inadequate medical
treatment."  A jury found for inmate Wareham on his claim and
awarded damages of $260,000.00 !  (Please note enclosed copy of
Williams v. Syed.)

The result ... $50,000.00 + $260,000.00 = $310,000.00 of taxpayers'
money!... paid out by the Pennsylvania Department of Corrections
for incompetent/inadequate medical treatment!  And, these are not
isolated cases; they are not the only two cases of taxpayer money
going to waste because of incompetence!!

Also of interest is the fact that this #310,000.00 does not appear
in the Pennsylvania Department of Corrections's budget that is is-
sued every year, as being paid out and for what it is paid for.
Why is this?!...  The Pennsylvania taxpayers are not told,... are
not made aware where these hundreds of thousands of dollars of their
money is going!  Why?!... You, as Govenor, must know about all this
money because the pay outs go through you.

I am sure you would agree with me that the Pennsylvania taxpayer did
not elect Pennsylvania's government officials to be using tax dol-
lars like this!  Also, I believe you would agree with me that if the
Pennsylvania taxpayers were made aware of these circumstances by the
media the taxpayers would vote out these government officials.

The point is ... such incompetence begins with individuals like Co.
McCall.  And, I trust you and your administration will want to in-
vestigate this situation and correct the injustices and remove in-
competent officials.  --  I cannot help but think how $310,000.00
(plus) can go a long way to provide quality education for the pub-
lic school children in Pennsylvania!

In closing ... I submit three final questions for your considera-
tion:

        1)  In the past ten years, how much money has

Page 4



been paid out in awarded damages and out-of-court settlements because the Pennsylvania Department of Corrections has been sued?

2)   Why is the Pennsylvania Department of Corrections, SCI Pittsburgh, and SCI Huntingdon operated so incompetently?

3)   Are the actions and unprofessional behavior of Co. McCall at SCI Huntingdon characteristic of the professional training received by guards and staff in the Pennsylvania Department of Corrections?

Thank you for your attention to this critical matter.  I await your reply.

Sincerely,


The Reverend Dr. Donald E. Moyer, Pastor
Spiritual Advisor to Mr. Richard Wojtczak, #AF5977
             SCI Huntingdon

Enclosure:  copy of WILLIAMS v. SYED



**BUREAU OF HEALTH CARE SERVICES**  PENNSYLVANIA DEPARTMENT OF CORRECTIONS

*P.O. Box 598/2520 Lisburn Road Camp Hill, PA 17001-0598*

*Telephone Number:  (717) 731-7031*
*Fax Number:  (717) 731-7000*

February 1, 2002

Reverend Dr. Donald E. Moyer, Pastor
Falkner Swamp Reformed Church
of the United Church of Christ
2077 Swamp Pike
Gilbertsville, PA  19525

Dear Reverend Moyer:

I am responding to your letter dated 1/14/02 as it relates to Inmate Wojtczak and his transfer to a facility that is more suitable to his medical needs.

The Corrections Health Care Administrator at each State Correctional Institution notifies the Bureau of Health Care Services (BHCS) regarding their inmate medical transfer needs.  The BHCS in turn determines the most appropriate site for inmate placement through a medical assessment of the inmate.

We assure you that appropriate procedures are being followed in the case of Inmate Wojtczak and due to security policy we are unable to inform you of Inmate Wojtczak's future housing arrangement.

Thank you for your concerns regarding this matter.

Sincerely,

Catherine C. McVey
Director
Bureau of Health Care Services

CCM/JT/cj

cc: Governor's Correspondence #20201262
    Superintendent Kyler
    Deputy Superintendent Williamson
    File: (Moyer.Donald-Reverend.#20201262.jt.2.1.02)

*"Our mission is to protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims."*

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

*Sci/Huntingdon, Pa.*

C/C

Commonwealth of Pennsylvania
Department of Corrections

C/C

**INSTRUCTIONS**

Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

*P. Everhart, Nurse Supervisor*

1.  To: (Name and Title of Officer)

2.  Date: *2-19-02*

3.  By: (Print Inmate Name and Number)
    *RICHARD WOJTICZAK AF5977*

    *Richard Wojticzak*
    Inmate Signature

4.  Counselor's Name *Leidy*

5.  Unit Manager's Name *Walters*

6.  Work Assignment
    *medically unable to work*

7.  Housing Assignment
    *BA 1040 cell*

8.  Subject: State your request completely but briefly. Give details.

RE: Degenerative bone disease in knees, hips, discs in spine

SHOWER — I can no longer walk the long distance to the ATA room shower, I can not shower in the cell block shower. Now I am back to NO SHOWER AT ALL.

BARBERSHOP — I can no longer make the long distance to the barber shop (across from chow Hall) my purchase of a new Electric Razor for the continued medical Treatment for the cysts on my scalp has been "rejected". No medical Treatment for this condition. No haircut.

LEGAL MAIL — I can no longer walk the long distance to the front of cell block for my legal Mail ETC.

CATHOLIC MASS — I cannot go to CATHOLIC MASS every week, I can not go up and down stairs to chapel

PROGRAMS — I can not attend Programs on 2nd floor, I can not go up and down stairs.

STAND FOR COUNT — It is now extremely painful for me to stand for count. This is "Another Misconduct" waiting to happen.

URINE TEST FOR DRUGS — I can no longer make the long walk to the ATA ROOM for Urine test for drugs. This is "another Misconduct" waiting to happen.

C/C

9.  Response: (This Section for Staff Response Only)

To DC-14 CAR only ☐

To DC-14 CAR and DC-15 IRS ☐

*Ed 53*

Staff Member Name _____ / _____   Date _____
          Print                    Sign

Revised July 2000



Richard Wojtczak AF-5977
1100 Pike Street
Huntingdon, PA 16654-1112

February 19, 2002

Mrs. Patty Everhart
Nurse Supervisor
1100 Pike Street
Huntingdon, PA 16654-1112

Dear Mrs. Everhart.

I have written to everyone possible, here at
SCI Huntingdon and the PA Dept. of Corrections, more than several
times concerning my disabilities.  Because of degenerating bone
disease in my knees, hips, disc in spine - walking and standing
is extremely painful for me.  I cannot go up or down stairs.  I
repeat, that walking/standing is extremely painful for me and I
cannot go up or down stairs.  These facts completely elude the
staff here at SCI Huntingdon - PA Dept. of Corrections.

Here at SCI Huntingdon, a maximum security facility, everyone
finds my disability very amusing and to make this situation
worse, go out of their way to make my life more miserable than it
already is.

I have explained to you on numerous occasions the 'encounters'
I have had with the less than professional staff here at SCI
Huntingdon.  I don't have to repeat myself again as to these
'encounters' with this writing.  This degenerating bone disease
is not for the entertainment of this unprofessional staff.  Not
to mention the unfounded, fabricated 'misconduct' which I have
already received because of my disability.  A 'misconduct' which
you told me should never have been written, if you remember.

With all the jerking around I have received concerning my
transfer to SCI Laurel Highlands, a facility which is suppose to
house disabled inmates, everyone keeps telling me that I am on
'the list' to go there, yet, I have been passed over twice on
this transfer!  What good is being on this 'list'?

Ex
54

It has now become obvious that I am not going to be transferred
to Laurel Highlands <u>or any</u> other level 2, minimum security facility.
I am classified as a level 2, minimum security inmate, I am not a
security problem!  Why am I treated as a maximum security inmate?
Where is the "less restrictive environment" and "more privileges"
as a level 2 inmate as per Donald Williamson of the PA Dept. of
Corrections?  It is also clear that SCI Huntingdon, a maximum
security facility, in no way can provide for my "special needs"
as a disabled, level 2, minimum security inmate.  All that SCI
Huntingdon is doing is inflicting more pain and suffering on me.

It is now unmistakable, I am not going to be transferred to
SCI Laurel Highlands or to any of the other three level 2, minimum
security facilities within the PA Dept. of Corrections.  SCI
Huntingdon - PA Dept. of Corrections will keep me at SCI Huntingdon
where I will suffer more pain under the authority of incompetent,
illtrained, unprofessional staff.

One of my <u>"special needs"</u> is that I must be housed in a
single cell.  Scott Walters, unit manager, told me that he had
called the DOC attorneys at Camp Hill.  He said their attorneys
told him that the Federal Civil Action in 1979, where SCI Graterford
transferred me to SCI Huntingdon, "doesn't mean anything".  I
strongly suggest the DOC hire new attorneys, that Civil Action
"does mean more than you mistakingly believe it doesn't"!

It is well worth mentioning here, do not transfer me to the
"inmate inpatient infirmary" at SCI Smithfield.  We both know
this is the <u>hole</u>, locked in a cell, a sink, a toilet, a bed,
that's it!  No personal property at all!  We went all through
that 'scenario' with Dr. Kimber (2000-2001) and that was eliminated
as a solution, if that refreshes your memory?

To get yet another misconception cleared up, I did not, I
repeat, I did not refuse <u>'a walker and canes'</u>!  This total disregard
for the truth (that I refused) again reflects the unprofessional,

- 2 -

total incompetence of "Corrections Staff".  This "walker and
additional canes" do not benefit, nor are they a solution to my
<u>Walking Disabilities</u>!  This is supported by the physical therapist
that I was taken to see at J.C. Blair Hospital (2000-2001).
(Read his report!)  Placing any resistance on the knee joints,
hip joints, and vertebrae causes the extreme pain (bone rubbing
against bone).  Walking, I repeat, walking, places this resistance
on the joints, this medical fact is continuously ignored by said
incompetent correctional staff.  This is why a 'walker, additional
canes' is of no benefit nor is it a solution.  Not that I 'refused'
same!

There is no cure for this degenerating bone disease, it only
gets worse (as per real medical professionals).  I am not going
to be transferred to one of the four level 2 minimum security
facilities in PA Corrections, I can no longer deal with this
extreme pain and suffering and the continuous conflicts with the
unprofessional, incompetent staff here at SCI Huntingdon.  You
are going to have to make real "reasonable accommodations" because
of my disabilities. . . ADA of 1990 - RA of 1973; DC-ADM 006. . .

<u>SHOWER</u>

I can no longer make the long walk to the <u>ATA room shower</u>.
I can not shower in the cell block shower.  So now I get no
shower at all!  Plus the blue chair I need to sit on has been
missing since 1/21/02; the shower head hasn't worked properly
since February 2001 (I told Capt. Lear about it twice - Nothing!).

Why I can't shower in the 'observation cell' in the medical
department as I did for years is beyond understanding. . . "to
provide a more confidential and secure area to do sick call and
doctor line", as I have been told, again reflects the unprofessional
and total incompetence of corrections staff!  "<u>Confidential</u>".....
inmates sit so close you can hear what they say to the doctor or
nurse!  Plus the shower in the "observation cell" isn't even

- 3 -

close to sick call and doctor line!  "Secure area", there is no
"security problem", there are at least 2 guards at the medical
department all day!  Plus, I am a level 2, minimum security
inmate, I am not a security problem"!  These excuses are pure
crap!  Telling me I can "do a sponge bath in my cell" proves my
point, that's a "real professional response"!

## BARBER SHOP

I can no longer walk the long distance to the barber shop
(across from the chow hall).  My purchase of a new electric razor
for the continued medical treatment for the cysts on my scalp has
been "rejected".  In order for the Cleocin-T Gel to work properly,
rub directly into cyst, I must shave my scalp every 3 days so the
hair does not absorb the gel!  For Dr. Symons to tell me that I
can get my hair cut in the barber shop (2/5/02) is totally incom-
petent and unprofessional!

The shaving of my head with an electric razor, applying the
Cleocin-T Gel directly to the cysts and taking Keflex-antibiotic
when necessary is prescribed medical treatment by Dr. Wingert, a
specialist in dermatology.  I have purchased and have had a
Norelco, 3 headed electric razor with trimmer for 15 years!
There has never been a security problem with me retaining the
shaver in my cell (no "tatoo guns or other devices").

I have also had Medical approval for this electric razor for
15 years...."above problems and solutions are long standing and
are necessary".  The electric razor is medical treatment and is
necessary.  This electric razor has also been approved by Correc-
tions Health Care Administrator, George Weaver; and Unit Manager,
Scott Walters.  To deny me this razor is denying me medical
treatment.  I have already developed four large cysts on my scalp
because I can not treat cyst condition properly!

## LEGAL MAIL

- 4 -

I can no longer make the long walk to the front of cell block to get my legal mail, etc., etc..

## PROGRAMS

I can not attend programs on the second floor.  I can not go up and down stairs to attend programs.

## CATHOLIC MASS

I can not attend Catholic Mass every week.  I can not go up and down stairs to chapel.

## STANDING FOR COUNT

I can no longer stand for count because of the pain in my knees, hip, and back.  This is another 'Misconduct' waiting to happen.

## URINE TEST FOR DRUGS

I can no longer make the long walk to <u>ATA room</u> for urine test for drugs.  This is another 'Misconduct' waiting to happen.

Now you can twist and turn all this with more of your usual excuses, you will even blame me, that its my fault for having these disabilities.  You can say 'there is no problem' (I have heard that one for 27 years, i.e. law suit at SCI Graterford).

It is much easier to blame the inmate than to deal profession-ally and solve these problems.  The bottom line is this....walking and standing causes me extreme pain, I can not go up and down stairs.  (1) You refuse to transfer me to a level 2, minimum security facility which would at least be easier on me...(2) You refuse to serve me hot meals in the medical department...(3) You

- 5 -

refuse to provide a place to shower which does not cause me pain...(4) You refuse to allow me to purchase a new 3 headed Norelco Electric Razor with Trimmer, to replace the one I have had for 15 years, which is medical treatment for the cysts on my scalp...(5) You force me to walk to front of cell block for my legal mail and other reasons knowing full well this causes me extreme pain...(6) You refuse to provide any 'reasonable accommodations for me to attend programs...(7) You refuse to provide any reasonable accommodations for me to attend Catholic Mass every week.

What you will "provide" is putting me in the hole at SCI Smithfield - "inmate inpatient infirmary", which is the HOLE, and issue me 'Misconducts'because of my disabilities, and you call all this 'reasonable accommodations', dispite...ADA of 1990 - RA of 1973; DC-ADM 006!

Lastly, before you tell me again, and I quote..."all people do not tell the complete truth when those individuals are seeking to gain or keep special privileges"..."It is my belief that you were mislead by what the inmate told you"...unquote.  Check the facts, all the facts, and the truth, we will then see who is telling the truth, and who is misleading who.

Richard Wojtczak AF-5977
1100 Pike Street
Huntingdon, PA 16654-1112

Copies to:

P. Yarger, Health Care Administrator
1100 Pike Street
Huntingdon, PA 16654-1112

Dr. Maue, Medical Director
PA Dept. of Corrections
Bureau of Health
520 Lisburn Rd.
P.O. Box 598
Camp Hill, PA 17001-0598
*(Certificate of Mailing)*

- 6 -

Ms. Joan Trees
Corrections Health Care Administrator
Bureau of Health Care
PA Dept. of Corrections
520 Lisburn Rd.
P.O. Box 598
Camp Hill, PA 17001-0598
*(Certificate of Mailing)*

Jeffery Beard, Phd.
Secretary
PA Dept. of Corrections
520 Lisburn Rd.
P.O. Box 598
Camp Hill, PA 17001-0598
*(Certificate of Mailing)*

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

C/C

Commonwealth of Pennsylvania
Department of Corrections

C/C

**INSTRUCTIONS**
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

*Dr. Long M.D. - Medical Director*

1. To: (Name and Title of Officer)

2. Date: 4-22-02

3. By: (Print Inmate Name and Number)
   RICHARD WOJTCZAK AF-5977

   *Richard Wojtczak*
   Inmate Signature

4. Counselor's Name    S. Moist

5. Unit Manager's Name

6. Work Assignment
   *medically unable to work*

7. Housing Assignment
   *infirmary*

8. Subject: State your request completely but briefly. Give details.

As I explained to you, the PRODONIX (sic) for my stomach problems - acid reflux, DOES NOT WORK FOR ME! Dr. Roemer put me on the PRODONIX (sic) to substitute for the PRILOSEC (sic) that I have been taking. PRILOSEC (sic) works for me! Over the YEARS I have tried the MULTITUDE of stomach remedies (Tagament-Zantar-Mylanta-Malox-Pepsid-et etc) PRILOSEC (sic) WORKS FOR ME! Despite these facts, and you NOT checking with Dr. Roemer NOR looking in my medical files, you just STOPPED the PRILOSEC (sic) and substituted PRODONIX (sic) which DOES NOT WORK! Sure enough the acid reflux started up - burning my throat (4-18-02) - EXTREMELY PAINFUL - Put me back on PRILOSEC (sic)! I also want to know why you have intentionally caused me to suffer!

9. Response: (This Section for Staff Response Only)

To DC-14 CAR only ☐

To DC-14 CAR and DC-15 IRS ☐

Staff Member Name _____ / _____    Date _____
                        Print              Sign

Revised July 2000

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

*C/C*

Commonwealth of Pennsylvania
Department of Corrections

*C/C*

**INSTRUCTIONS**

Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

*Dr. R. Long M.D. Medical Director*

| 1. To: (Name and Title of Officer) | 2. Date: *4-24-02* |
|---|---|
| 3. By: (Print Inmate Name and Number) *RICHARD WOJTEZAK AF5977* | 4. Counselor's Name *S. Moist* |
| *[Inmate Signature]*  Inmate Signature | 5. Unit Manager's Name *?* |
| 6. Work Assignment *Medically unable to work* | 7. Housing Assignment *infirmary* |

8. Subject: State your request completely but briefly. Give details.

*RE: Request Slip 4-22-02; PRILOSEC (sic). I have had a Hiatal Hernia & Acid Reflux disease for over 10 years (see my Medical file). I do watch what I eat and watch it when I purchase at Commissary. Along with this I have been on (Special) diets and numerous numerous Medications for this medical conditions. NONE OF WHICH WORKED — after many years of this and even PRILOSEC (sic) was found to work! As I told you Dr. Roemer put me on PRODONIX it does NOT WORK FOR ME (FORMULARY or NOT). Dr. Roemer put me BACK ON PRILOSEC (sic) which does work (check my medical file & Dr. Roemer). Dr. Reince, Dr. Kimber, Dr. Roemer and OTHER DOCTORS have OVERRIDDEN THIS "FORMULARY", which you mention, to give me PRILOSEC — YOU CAN DO THE SAME! This has Nothing to do with DIET, NOR with COMMISSARY! It is your personal refusal to override this formulary as numerous doctors have done in the past and you causing me unnecessary suffering! "DOCTOR"!*

9. Response: (This Section for Staff Response Only)

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

Staff Member Name _____ / _____  Date _____
                              Print                                    Sign

*Exh A
56*

DEPARTMENT OF CORRECTIONS
SCI-LAUREL HIGHLANDS

Date _05/22/02_  NO.
RESTRICTIONS.
(listed)

**SUBJECT:**   MEDICAL EQUIPMENT ISSUE

**TO:**   _Wojtczak Richard AF5977_

**FROM:**   _Medical._

You have been issued the following equipment to be used as instructed:

| | | | |
|---|---|---|---|
| ○ | Ice Bag | ○ | TED Hose |
| ⊗ | Knee Brace _elastic (2)_ | ○ | Ace Bandage |
| ○ | Splint | ○ | Sling |
| ○ | Crutches | ○ | Walker |
| ⊗ | Cane | ○ | Hot Water Bottle |
| ⊗ | Other: _Wheelchair, 2 extra pillows_ | | |

You are to return above equipment to Outpatient on    _ongoing_
                                                       Date/Time

_Richard Wojtczak 5-22-02_
Inmate Signature/Number

_[signature] RN2_
Staff Signature

EX
57

LAW OFFICES

# LEVY & PREATE

SCRANTON ELECTRIC BUILDING
507 LINDEN STREET, SUITE 600
SCRANTON, PENNSYLVANIA 18503

TELEPHONE (570) 346-3816
FACSIMILE (570) 346-5370
levypreate@adelphia.net

ERNEST D. PREATE, JR.
ROBERT A. PREATE
WILLIAM T. JONES*
HOWARD C. TERRERI**
DAWN M. RICCARDO

*ALSO MEMBER DISTRICT OF COLUMBIA BAR
**ALSO MEMBER NEW JERSEY BAR

J. JULIUS LEVY (1924-1978)
ERNEST D. PREATE, SR. (1934-1995)

OF COUNSEL
DAVID B. MILLER
DAVID J. TOMAINE

July 22, 2002

Richard Wojtczak, #AF-5977
1100 Pike St.
Huntingdon, PA 16654-1112

Dear Richard:

I received your packet of information. Thanks for the letter and the kind words of appreciation.

You have some questions about the A.D.A. I can assure you that one of the reasons I put together the legislation mandating "The Study" (S.R. 149) was to examine the "seriously ill". This means the mentally and physically disabled.

I am sure the Advisory Task Force will want to know if the DOC is complying with the A.D.A.. And, they certainly will if you write to the Advisory Committee, and, tell them about the DOC shortcomings. But that is down the road once the Study is put into law.

It passed the House on June 28th , but, by the time it got back to the Senate for concurrence on June 29th , the Senate had adjourned until September 23rd . They will surely take it up at that time, or, in the three (3) week session that follows. That means the Advisory Committee will not be appointed until Nov./Dec., which is not too bad, because if Rendell is elected, we will have more compassionate people on the Advisory Task Force.

I have made a copy of the lawsuit you filed. I am sending you back two (2) copies so you can send them to someone else. (I know copies are expensive).

Thanks for the revelations about SCI-Laurel Highlands. You are first to give me such good insights. Please write to Pa. Prison Society, 2000 Spring Garden St., Philadelphia, PA 19130-3805, Graterfriends, 541 Swede St., Norristown, PA 19401, Justice & Mercy, 638 Mt. View Rd., Reading, PA 19607, and, Pa CURE, 616 Light St., Millersburg, PA 17061-1139.

Also write to "From the Inside", P.O. Box 58131, Pittsburgh, PA 15209, and, "Lifeline", P.O. Box 61, Bensalem, PA 19020 (latest copies enclosed).



People in the prison reform movement, especially Bill DiMascio, Executive Director of Pa Prison Society, need to hear from you on a regular basis.

Stay strong.



Sincerely,

Ernest D. Preate, Jr.,  Esq.

EDP/js
Enclosures - 2 copies of lawsuit
          Copies of various prison reform organization newsletters
3@RESEARCH\PC\WOJTCZAK,RICHARD.07.22.02

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**SCI-Laurel Highlands**
Superintendent's Office
(814) 445-6501
August 5, 2002

**SUBJECT:**  Inmate Request

**TO:**    Richard Wojtczak, AF-5977
           AC

**FROM:**   Fredric A. Rosemeyer
            Superintendent

In response to your Request dated August 1, 2002:

1.  Wheelchair – approved;
2.  Wheelchair seat pad/covers – approved;
3.  Dark glasses – not approved; and,
4.  Canvas shoes – approved.

**PLEASE NOTE:**  You, the wheelchair and equipment
are subject to search before and after each visit(s).

Regarding the sunglasses:  You need to discuss this with our Medical Staff to get your
facts correct.  The facts that I am pertaining to are the following:

1.  Mr. Kaufman's position with SCI-Laurel Highlands;
2.  Why and who ordered the dark glasses; and,
3.  What really was noted by the ophthalmologist.

If I can be of any other assistance, please let me know.

FAR:csd

cc:   Mr. Wiser, Unit Manager
      Ms. Kowalewski, CHCA
      File, AF-5977

# PENNSYLVANIA'S STATE DEPARTMENT OF

# CORRECTIONS

## ADMINISTRATOR'S

SEPT. 23, 02

Mr. Jeffery A. Beard, PHD.,

Executive Deputy Secretary

Pennsylvania's Dept. Of Corrections

Penna., Dept., Of Corrections

P.O. Box 598

Camp Hill, Pa., 17001-0598

Mr. Fredric A. Rosemeyer

Superintendent

S.C.I. Laurel Highlands

Somerset, Pa., 15501-0631

Mr. John Paul

Classification & Program Manager

S.C.I. LAUREL HIGHLANDS

5706 GLADES PIKE

SOMERSET, PA., 15501-0631

Mr. Donald Williamson

Coordia., Diagnostic & Classification

Bureau Of Inmate Services

Penna., Dept., Of Corrections

P.O. Box 598

Camp Hill, Pa., 17001-0598

Ms. Nardi Hansberger

Deputy Superintendent

S.C.I. Laurel Highlands

Somerset Pa., 15501-0631

KOWALEWSKI

Ms Annette Kowolewski

Corrections Hlth., Care Admin.,

S.C.I. LAUREL HIGHLANDS

5706 GLADES PIKE

SOMERSET, PA., 15501-0631

FROM............................................Richard Wojtczak ....Inmate ..AF-5977

S.C.I. LAUREL HIGHLANDS

5706 GLADES PIKE

SOMERSET, PA., 15501-0631

D-A BLOCK

Don, Please send me 4 copies of this K

Ex
60

Re: Inmate Richard Wojtczak, Official Request To Be Immediately Transferred To A Level Two (2) Minimum Security Facility........

The Pennsylvania Department Of Corrections (D O C ) Has <u>Classified Me As A Level Two (2)</u>, Minimum Security Inmate; I'm Not A Security Risk.    A <u>Custody Level (2)</u> (Minimum Security Inmate), Is One Who Demonstrates Patterns Of Non-Aggressive Behavior:

1. By Their Behavor And Record They, Require Less Observation By The Staff;

2. Security Level Two (2), Facilities Have A Less Restrictive Inviorment;

3. Security Level Two (2) Facilities Have Less Restriction Of Activities;

4. As A Custody Level Two (2) Case, You Have More Privileges Than Higher Custody Level Inmates....(What Are The More Privileges ?).

THESE ARE THE CRITERIA SET FORTH BY THE PENNSYLVANIA DEPARTMENT OF CORRECTIONS (D O C ) AS PER <u>MR. DONALD WILLIAMSON</u>

Coordinator - Diagnostic And Classification,

Bureau Of Inmate Services

P.O. BOX 598

Camp Hill, Pa., 17001-0598  Telephone..(717) 975-4859,

<u>Describing Level (2) Minimum Security.</u>

I'm Presently Housed At S.C.I. Laurel Highlands....Somerset Pa.,..S.C.I. Laurel-Highlands <u>Does Not</u> Meet The Above Mentioned Criteria, For A <u>Level Two (2) Minimum Security Facility,</u>  And Is Therefore, <u>Not Minimum Security.</u>

I'm Formally Requesting In Writing (AGAIN), <u>To Be Immediatly Transferred To A Level Two (2) Minimum Security Facility.</u>

FROM THE FOLLOWING FACTS, IT IS OBVIOUS THAT S.C.I. LAUREL HIGHLANDS IS NOT A MINIMUM SECURITY FACILITY:

FROM 05-21-02, To 08-31-02, Just A Three (3) Month Period, S.C.I. Laurel Highlands, Subjected Me To The Following:

(A) STOPPED MEDICATION TREATMENT THAT: "I Was Taking For Long Standing Chronic Med-
    Medical Problems (Cyston Scalp-Sinus-Acid Reflux, Hiatel Hernia-Prostate Causing
Me Pain And Suffering)"

(B) STOPPED TREATMENT "I Was Receiving For Degenerating Bone Disease In Both Knees,
    Hips, Disc In Spine For Over A Year In S.C.I.'s Huntingdon And Smithfield; I
    Cannot Walk, I Require A Wheel-Chair. ( Causing Me Pain And Suffering)

(C) STOPPED TREATMENT: That I Was Receiving For Eye Problems From An Eye Special-
    ist, A Qualified Licensed OPTHOMOLOGIST, (Causing Me Pain And Suffering)'

(D) DENYING ME OUTDOOR RECREATION.........Yard;

(E) DENY ME ....Purchasing Items From The Commissary;

(F) PROPERTY SEARCHES ....Three (3) Times In A Week: 08-07-02, To 08-13-02....This
    IS NOT A SEARCH FOR CONTRABAND...It Is PURE HARRASSMENT And ATTEMPTED INTIMIDATION
    And BULLY SCARE TACTICS By GUARDS: K. CRISSEY, RITERNOUR (Sic) URBAN; I Was Also
    THREATENED By The Guards"; I Took This Problem To C.O. SHAFFER; LT., TURNER
    CAPT., HILER; The Guards Behavior Was Totally Unpro fessional .;

(G) EVENTHOUGH, I'M IN A WHEELCHAIR AND A LEVEL TWO (2) INMATE:
    When I'm Taken Outside The Prison (To A Doctor Etc.,) I'm Handcuffed With The
    "BLACK BOX" CHAINS AND LEG IRONS (Causing Me Pain And Suffering).

IT IS OBVIOUS, FROM THESE FACTS, AS A LEVEL TWO (2) MINIMUM SECURITY INMATE
HERE AT S.C.I. LAUREL HIGHLANDS:

(1) I DO NOT Receive....LESS OBSERVATION BY THE STAFF;

(2) I AM NOT IN A LESS....RESTRICTED INVIORMENT

(3) I DO NOT HAVE.........LESS RESTRICTIONS ON ACTIVITIES

(4) I DO NOT HAVE.........MORE PRIVILEGES....Than Higher Custody Level Inmates;


MY HAVING TO USE A WHEELCHAIR, BECAUSE OF MY DISABLING BONE DISEASE (CAN NOT WALK)
Does Not NEGATE  The Rights And More Privileges I Am To Receive As A LEVEL 2 Minim-
um Security Inmate, As Per Mr. Donald Williamson, Penna. Dept Of Corrections (DOC),
SUPRA, .

PLUS: The Above Is Without Applying The AMERICANS WITH DISABILITIES ACT OF 1992,
REHABILITATION ACT 1973, To My Situation........THESE FEDERAL LAWS DO    APPLY
To The PENNSYLVANIA DEPARTMENT OF CORRECTIONS  (DOC) AT  S.C.I. LAUREL HIGHLANDS


                              I Am Again Requesting To

                              Be Immediately Transferred

                              To A Level Two (2), Minimum Security

                              Facility.


                                        Sincerely,



*10-11-02 Rec*

**PENNSYLVANIA DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PENNSYLVANIA 17001-0598**
**(717) 975-4859**

October 4, 2002

Richard Wojtczak, AF-5977
SCI Laurel Highlands

Dear Mr. Wojtczak:

Your recent letters to Secretary Beard and other staff have been forwarded to my office for response. You do not consider SCI Laurel Highlands to be a custody level 2 facility based upon your alleged mistreatment by Laurel Highlands staff. As a result, you are requesting transfer to a custody level 2 facility.

Despite your claims and observations the Department does consider SCI Laurel Highlands to be a custody level 2 facility.

In addition, you were transferred to SCI Laurel Highlands specifically for medical care by Central Office medical staff. Therefore any future transfer on your behalf must be directed by medical staff. Until a future medical transfer is requested, you will remain at Laurel Highlands.

Sincerely,

Donald Williamson
Coordinator/Diagnostic & Classification
Bureau of Inmate Services

DW/jk

cc:   Supt. Rosemeyer (LAU)
      File

*Don, please send me 4 copies of this!*

*Ex
61*

The attached information AND another request for a Transfer to a Custody Level a Minimum Security facility has been sent TO THE FoLLoWiNG by Certificate of Mailing or by intra prison mail _ _ _ _ _

MR. E Rendell

Governor of Penna.
225 Main Capitol
Harrisburg, Pa. 17120

John Thomas

Executive Assist. to the Secretary
Pa. Dept. of Corrections
2520 Lisburn Rd. P.O.Box 598
Camp/Hill, Pa. 17001-0598

H. Clifford O'Hara

Director
Office of Professional Responsibility
Pa. Dept. of Corrections
Camp/Hill, Pa. 17001-0598

D. Mane

Medical Director
Pa. Dept. of Corrections
2520 Lisburn Rd. P.O.Box 598
Camp/Hill, Pa. 17001-0598

Jeffrey A. Beard, Ph.D.

Secretary
Pa. Dept. of Corrections
2520 Lisburn Rd. P.O. Box 598
Camp/Hill, Pa. 17001-0598

William D. Sprenkle

Director
Office of Staff Development &
Training
Pa. Dept. of Corrections
2520 Lisburn Rd. P.O. Box 598
Camp/Hill, Pa. 17001-0598

Catherine McVey

Director
Bureau of Health Care Services
Pa. Dept. of Corrections
2520 Lisburn Rd. P.O. Box 598
Camp Hill, Pa. 17001-0598

Ex
62

(A)

Michael Farnan
Office of Chief Legal Counsel
Pa. Dept. of Corrections
2520 Lisburn Rd. P.O. Box 578
Camp Hill, Pa. 17001-0598

Mr. Joan Trees
Corrections Health Care Adm.
Bureau of Health Care
Pa. Dept. of Corrections
2520 Lisburn Rd. P.O. Box 578
Camp Hill, Pa. 17001-0598

Robert J. De Sousa
Pa. Inspector General
9th fl. Harristown 2
333 Market St.
Harrisburg, Pa. 17126

MR. Ernie Preate Jr. Esq.
Attorney at Law
507 Linden St. Suite 600
Scranton, Pa. 18503

Greater friends Inc.
Ms Joan Danker, Managing Editor
541 Swede St.
Norristown, Pa. 19401

Senator Stewart J. Greenleaf
Penna. Judiciary Committee
27 North York Rd.
Willow Grove, Pa. 19090

Senator John Wozniak
Somerset County Pa.
2307 Bedford St.
Johnstown, Pa. 15904

Fredric A. Rosemayer
Superintendent
SCi Laurel Highlands
5706 Glades Pike P.O. Box 631
Somerset, Pa. 15501-0631

Mardi Hunsberger
Deputy Superintendent
SCi Laurel Highlands
Somerset, Pa. 15501-0631

John Paul
Classification & Program Manager
SCi Laurel Highlands
Somerset, Pa. 15501-0631

(3)

Dr. Jawad Salameh
Medical Director
SCI Laurel Highlands
Somerset, Pa. 15501 - 0631

Ms. Annette Kowalewski
Corrections Health Care Adm.
SCI Laurel Highlands
Somerset, Pa. 15501 - 0631

S/ Richard Softugh AF5177
SCI Laurel Highlands
5706 Glades Pike
P.O. Box 631
Somerset, Pa. 15501 - 0631
c/c

©

To:
See atte...

budget is:

*15 million — grants to volunteer fire companies

*6 million — Gov. Ridge's favorite community programs & programs

*2 million — State police safety equipment

commissary prices Inmate Welfare Fund

Date: 5-1-03

Richard Vojtczak AF5977
Sci Laurel Highlands
5706 Glades Pike
P.O. Box 631
Somerset, Pa. 15501-0631
by certificate of Mailing
c/c

When the reality, of the operations of the State Correctional Institution at Laurel Highlands, which is proported to be a SECURiTY CUSTODY LEVEL 2, MiNiMUM SECURiTY FACiLiTY, is compared to the CRiTERiA of a LEVEL 2, MiNiMUM SECURiTY FACiLiTY PUBLiSHED by the Pa. Dept. of Corrections; SCi Laurel Highlands is NOT a SECURiTY CUSTODY LEVEL 2, MiNiMUM SECURiTY FACiLiTY!

I am AGAiN requesting to be TRANSFERRED to a LEVEL 2 MiNiMUM SECURiTY FACiLiTY. I have been to ALL the STAFF AT Sci Laurel Highlands AND at the Doc camphill, Pa. WiTh No ResuLTS!

I have been classified by the Pa. Dept. of Corrections as a SECURiTY LEVEL 2 MiNiMUM SECURiTY iNMATE as designated by the Pa. D.O.C. ___
① I have demonstrated patterns of NON-AGGRESSiVE behaviour ___
② By my behaviour AND RECORD I require LESS DiRECT OBSERVATiON by STAFF ___

①

③ I have more privileges than higher-priority Level inmates

I am <u>NOT</u> a Security Risk!

The Pa. Dept. of Corrections has classified THEIR Level 2, MINIMUM SECURITY FACILITIES ... AS FOLLOWS ___
   ① a LESS RESTRICTIVE ENVIORNMENT ___
   ② MORE OPEN SPACES ___
   ③ LESS RESTRICTION ON ACTIVITIES ─

Websters, NewWord DICTIONARY __ "<u>MINIMUM</u>" = smallest, least, lowest, Narrowest, the smallest quantity possible; the lowest degree or point reached ...

SCI Laurel Highlands has a <u>DOUBLE Fence WITH RAZOR WIRE</u> all is 'classified' as a 'Level 2, MINIMUM SECURITY FACILITY ___
SCI Smithfield has a DOUBLE Fence WITH RAZOR WIRE and is 'classified' as a Level 4, MAXIMUM SECURITY FACILITY ___
   How can they be the same ??

It should ALSO be <u>NOTED</u>:
   <u>Different</u> priority Custody Level inmates CAN NOT be MIXED TOGETHER IN THE SAME FACILITY! i.e. __ LEVEL 2, MINIMUM SECURITY INMATES MIXED in with LEVELS 3-4-5 MAXIMUM SECURITY INMATES .... the LEVEL 2 inmates are then treated like MAXIMUM SECURITY INMATES ─ LEVEL 2, MINIMUM Security INMATES LOSE ALL their Level 2 "PRIVILEGES"! (whatever they are?)

②

Facility personel are <u>NOT TRAINED</u> in the treatment — laundring of LEVEL 2, MINIMUM SECURITY INMATES — — to the detriment of the <u>inmate</u>, AND to the detriment in the operation of the facility!

<u>FACTS</u>: Supported by documentation (attached) and by STAFF witnesses and <u>INMATE WITNESSES</u> — — —

<u>SEARCHES OF MY PROPERTY</u> from FEB. 2002 TO JAN. 2003
<u>11 MONTHS</u>

1 Time when I <u>LEFT</u> SCI Huntingdon To SCI Smithfield — — <u>Feb. 2002</u>
1 Time when I <u>ARRIVED</u> at SCI Smithfield From SCI Huntingdon — <u>Feb. 2002</u>
1 Time WHILE AT Smithfield — <u>March 2002</u>
1 Time when I <u>LEFT</u> Smithfield to SCI Laurel Highlands — <u>May 21, 2002</u>
1 Time when I <u>ARRIVED</u> at ▓▓▓ at SCI Laurel Highlands — ▓▓▓ — From SCI Smithfield — — — — <u>May 21, 2002</u>
2 Times at SCI Laurel Highlands, <u>June 18, 2002</u>, <u>July 2002</u> on A C unit Bed 5-4
3 Times at SCI Laurel Highlands <u>Aug 7, 2002</u> To <u>Aug 13 2002</u> on A C unit Bed 5-4
1 Time at SCI Laurel Highlands <u>Nov. 8, 2002</u> on DA unit Bed 18-2
1 Time at SCI Laurel Highlands <u>Dec 10, 2002</u> on DA unit Bed 18-2
1 Time at SCI Laurel Highlands <u>Jan, 23 2003</u> on DA unit Bed 1-1
1 Time AT SCI Laurel Highlands <u>Jan. 27 2003</u> on DA unit Bed 1-1
  1 Time at SCI Laurel Highlands <u>Dec. 13, 2002</u> on DA unit Bed 18-2

<u>15 SEARCHES in 11 MONTHS</u> !!!

③

IN ADDITION to the 15 PROPERTY-CELL SEARCHES
at Laurel Highlands FROM 9-16-02 TO 10-12-02 (1 MONTH),
I WAS SEARCHED 19 TIMES when I left dining
Hall after I ate! 19 TIMES

I have been SEARCHED 34 TIMES in
11 MONTHS !!!

and I am supposed to be a Level 2, MINIMUM SECURITY
INMATE, at a LEVEL 2, MINIMUM SECURITY FACILITY !

I was moved to DA unit on 9-12-02
(The 'Search Team' has 'searched' DA UNIT (Since 9-12-02) _ _ _
Sept. 2002, Oct. 2002, NOV. 2002, Dec. 2002, JAN. 2003
    (5 MONTHS)

SCI Laurel Highlands and Pa. D.O.C. 'SAY' there are 'random'
searches _ that they 'search' by BED NUMBER NOT the
'INMATE'. Doc policy is to have a 'cell search (property)' at a
MINIMUM OF TWICE PER YEAR unquote (Rosemeyer 10-25-02).
The FACTS show my property-cell was searched at SCI Laurel Highlands
FROM May 21, 2002 to Jan. 2003 = 8 MONTH PERIOD _ _ _ _

11 TIMES ! 5-31-02 = 1°, Jun-Jul 2002 on Activet BED 5-4 = 2 times,
Aug 7th, Aug 13, 2002 on Activet BED 5-4 = 3 Times° Nov 8, 2002 on DA
unit BED 18-2; Dec. 10, 2002 on DA unit BED 18-2', Dec. 13, 2002, DA
unit BED 18-2; Jan. 23, 2002 DA unit BED 1-1'; Jan 27, 2003 DA
unit BED 1-1 = 11 Times in a "1 YEAR Period of Time" _ _
_ ALSO _

④

-- when you look at the "DATES" of these 'searches'
I AM BEING SEARCHED EVERY MONTH!
( this is NOT a 'minimum of TWICE PER YEAR ( 12 month period ) )
This is NOT "RANDOM search BY BED NUMBER" ----

--- This is NOT a 'LESS RESTRICTIVE ENVIRONMENT" of a Level
2, MINIMUM SECURITY FACILITY ---

--- This is NOT "LESS OBSERVATION BY STAFF" of a Level 2,
MINIMUM SECURITY FACILITY ---

-- This is NOT the "MORE PRIVILEDGES" of a LEVEL 2, INMATE

-- The 50ft × 50ft 'court yard' for outdoor recreation is
NOT 'the more open spaces' of a Level 2, MINIMUM
security facility ----

Despite the Repeated 'claims and observations' by the Pa.
D.O.C. and SCI Laurel Highlands, that SCI Laurel Highlands
is an LEVEL 2, MINIMUM SECURITY, the FACTS belie this
; letters.

SCI Laurel Highlands is NOT operated as a MINIMUM
Security Facility --- you can't talk the world into being FLAT,
when the REALITY is, the world is ROUND.

Being classified as a LEVEL 2,
MINIMUM SECURITY INMATE
I am AGAIN Requesting to be
Transferred to a LEVEL 2,
MINIMUM SECURITY FACILITY.

⑤

Medical Care - Treatment (SCI Laurel/Highlands) --

As can be seen by the attached letters, articles, documents, the Pa. D.O.C. PRETENDS that SCI Laurel /Highlands is designed specially to provide the utmost care, specialized care, of elderly and disabled prisoners

The following FACTS, which can be [PROVEN with documents, my medical files, inmate and staff witnesses -- reveal that the Medical Care - Treatment at SCI Laurel/Highlands is far below acceptable, minimal medical standards.

Along with other medical difficulties, I have --
(1) degenerating bone disease of the knees, hips, disc in spine --
(2) Chronic cyst condition on scalp - face - other areas -- (3)
Hiatal Hernia - and Reflux disease.

(1) Degenerating bone Disease - this Chronic - painful condition now has me confined to a wheelchair!

While I was housed at SCI Huntingdon, AND SCI Smithfield, (prior to being Transferred to SCI Laurel/Highlands) FOR OVER 1 YEAR I Received GLUCOSAMINE (by Dr. Kimber, medical director at SCI Huntingdon).

This GLUCOSAMINE MUST Be TAKEN LONG TERM TO Be EFFECTIVE. The GLUCOSAMINE DID START TO WORK!

When I was Transferred to SCI Laurel/Highlands on 5-21-02 (from SCI Smithfield) the GLUCOSAMINE was, IMMEDIATELY STOPPED - Discontinued By -- -
Dr. JAWAD Solameh medical director, Physician's Assistants

(6)

_ELLIS KAUFMAN_, _JEFF TURGEON_ !

I was 'told' __ "We can't get that"! I told Dr. _JAWAD_ _Salameh_, _Kaufman_, _Turgeon_ to contact sci/Huntingdon — sci/Smithfield and the Doc at Camp/Hill AND FIND OUT How THEY GOT THE _GLUCOSAMINE_ for me "overriding the Doc" "formulary for drugs" and do what they did! !

I Received _NO_ _RESPONSE_!

The RelieF I received from the _GLUCOSAMINE_ has now disappated in the _9 MONTHS_ it was STOPPED!

The Severe Pain and Suffering has now returned!

_Salameh_, _Kaufman_, _Turgeon_ have caused me severe pain and suffering intentionally! Deliberate indifference to my suffering — _NEGLIGENCE_.

"Regular Tylenol" 3x day given very little relief (some days _No Relief at ALL_)!

(2) Cyst condition, Scalp Face ___ — this chronic condition can not be cured. It can Only be PROPERLY TREATED to keep the Cysts under Control. _Not_ properly Treated the CYSTS SCAR, SCAR scalp AND SCAR FACE. _Not_ properly Treated CYSTS get _large_, bleed and are extremely _Painful_

After seeing Dr. Wingert, a specialist in dermatology, and years of "Trial & error" of different types of treatment it was discovered the PROPER TREATMENT For the Cysts THAT WORKS IS ___ —

(7)

① Shave scalp with ELECTRIC RAZOR. ② Apply Cleocin-T
to cysts. ③ When cysts get out of control. ④ Take
ANTIBIOTIC KEFLEX 500mg 3x day for 20 days (or longer).

✗✗✗ This 3 Part TREATMENT HAS PROVEN
To WORK on this cyst condition!
(This is well documented in my
PRISON MEDICAL FILES)

I have had an ELECTRIC RAZOR (or I purchase it) for my past
20 years (for my cyst problem) ... In FEB 2002 my ELECTRIC RAZOR
broke, AFTER NUMEROUS ARGUMENTS I went to SCI Camp Hill / Highland,
AND DESPITE the Medical Approval for RAZOR from the
D.O.C. at Camp Hill — Dr. Blood Arthur — SCI Houtzdale
/ Highlands REFUSED to allow me to PURCHASE A Replacement
ELECTRIC RAZOR AND CONFISCATED my old RAZOR so I could not
get it repaired! I finally Purchased a New RAZOR 10-1-02 —
8 MONTHS WITHOUT PROPER TREATMENT FOR CYSTS.

Without TREATMENT I BROKE OUT in very large and
painful cysts — they SCARRED MY SCALP and SCARRED
MY FACE! causing me severe PAIN AND SUFFERING!
I then could shave my scalp but I did NOT receive
the Cleocin T and Keflex antibiotic. Cysts still
out of control.

On 12-10-02 I received Doxycline 100mg 2x day, for
replacement for KEFLEX. — Doxycline DID NOT WORK!
Finally on 1-10-03 I received Cleocin I. BUT STILL NO
KEFLEX antibiotic.
Without the 3 PART TREATMENT (see above) (shave
scalp; apply Cleocin T; Take Keflex antibiotic) cysts are still

⑧

Very Bad (on 2-19-03).

I have repeated this Cryst situation to Dr. JAWAD Salameh; Ellen Kaufman; Jeff Twigeon — I was TOLD — "You don't tell us what to do"!

They have caused me severe Pain and Suffering —, Intentionally —, Deliberate indifference to my suffering, Negligent —, And causing my Scalp and FACE to be scarred.

③ Hiatal Hernia — Acid Reflux disease — — — I was taking PRILOSEC (sic) for this very painful condition.

The PRILOSEC (sic) was STOPPED — Discontinued and I was placed on PROTONIX, which gives very little relief. On Protonix I now have stomach pain AND diarrhea for the last 9 MONTHS.

Dr. Jawad Salameh; Ellen Kaufman; Jeff Twigeon have refused to put me back on PRILOSEC (sic) — this is Deliberate indifference to my Suffering, it is Intentional Negligence causing me pain & Suffering.

I direct your attention now to the attached article concerning SCI Laurel Highlands — "Managing the Twilight Years" Contrary to the PROPAGANDA — PUBLICITY, SCI Laurel Highlands — IS NOT A PRISON OF COMPASSION — —

— NOT ALL THE STAFF HAVE PROFESSIONALISM AND CARING ATTITUDES

— WE ARE NOT TREATED AS WE WOULD IN ANY HOSPITAL — —

— THE PRISONS MEDICAL FACILITIES ARE NOT STATE of TH ART — — —

⑨

- - - sci Laurel Highlands is **NOT** a respected pioneer in the SPECIALIZED CARE of ELDERLY and DISABLED PRISONERS

- - Also, the "Article from Xpatofriends" (attached) about sci Laurel Highlands **IS** TRUE - -

This is just a 'tiny glimpse' past the MAZE OF MIRRORS the D.o.C and sci Laurel Highlands uses! Come here, Talk to the INMATES, Especially Abrit and D unit!

They can push an inmate into the day room for a "fire drill" - - - yet they can't push him OUTSIDE FOR SOME FRESH AIR AND SUNSHINE. So this INMATE, is on his back - IN A BED - HASN'T been OUTSIDE for YEARS

"compassion"?   "PROFESSIONALISM"?
"caring attitude"?   "STATE of TH-ART"?
"respected pioneer"?   "Specialized care"?
Where?

All of this is just the tip of the iceberg here at Sci Laurel Highlands and the Pa. Dept of Corrections. Sci Laurel Highlands IS NOT / HAS NOT been in compliance with Rehabilitation Act / Americans with Disabilities Act - Since it "opened in 1996 (7 years) - And the Pa. D.o.C. has NEVER been in compliance with the Rehabilitation Act / Americans with Disabilities Act! Yet the DOC and Laurel Highlands CONTINUE to Receive FEDERAL FINANCIAL ASSISTANCE

(10)

FEDERAL FUNDING — How can the Pa. D.O.C. and SCI Laurel/Highlands VIOLATE FEDERAL LAW AND STILL RECEIVE FEDERAL FUNDING ???

I have written to EVERYONE within the Pa. Dept. of Corrections concerning these issues AND I have written to individuals OUTSIDE the Pa. Dept. of Corrections concerning these issues — — —

— ALL I Receive are DENIALS, "Lies" and everything is just fine, meaningless RHETORIC, NOTHING is done to correct all the problems! ALL TALK, NO ACTION!!

To bring this segment to a close, I would just add a sprinkling of bits of information (in addition) that EVERYONE and I do mean EVERYONE will NOT look into - discuss !!

1. I have been at SCI Laurel/Highlands since 5-21-02 (9 MONTHS) and I have NOT received a HOT MEAL YET — — —

2. SCI Laurel/Highlands, allegedly, a Minimum Security Facility, tries to 'excuse' 'all the SEARCHES' by saying — they 'don't have all the violence and assaults by inmates as other prisons because they 'continually' SEARCH the prison.
At first 'impression' — 'blush' this reasoning would seem to be True — — — However it is NOT.

(11)

The real TRUTH, is not far away, it is found in the Pa. Dept. of Corrections' Criteria for a Custody Level 2, Minimum security inmate

— "the inmate's RECORDED BEHAVIOUR have DEMONSTRATED patterns of NON-AGGRESSIVE BEHAVIOUR

— "inmate requires LESS DIRECT OBSERVATION BY STAFF

— "inmate NOT A security RISK

Supplementary to this, the inmates here at SCI Laurel Highlands are getting close to parole or completing their sentences. In other words, they are very close to getting out of prison! They are NOT going to risk getting out of prison by "causing trouble", they DO NOT want to be transferred to a "Maximum Security" facility (SCI Huntingdon — SCI Graterford — SCI Pittsburgh etc.).

If an inmate is a "security risk", cause "security problems" ... he would NOT be at Laurel Highlands, would he!


3. About a year ago, a Pa. state representative was here at SCI Laurel Highlands, a convicted felon — an inmate. His name __ THOMAS DRUCE ⓐ was his "bed randomly SEARCHED", was he "randomly searched out of dining hall" ___ 34 TIMES IN A MONTHS? (15 property searches ; 19 searches out of dining Hall) NO HE WAS NOT SEARCHED 34 TIMES !!! WHY?

ⓑ Was his Medical TREATMENT STOPPED causing him unnecessary Pain and Suffering? NO IT WAS NOT !!! why?

⑫

4. the Pa. D.O.C. complains that they "do not have enough money" (see attached article) __ Yet the Pa. Doc. takes money FROM THEIR YEARLY BUDGET ... and gives it to other AGENCIES WHO HAVE THEIR OWN BUDGETS __ Why?

——— $6 MILLION ___ from Pa. D.O.C. to Governor Ridge's juvenile community Programs ___

——— $2 MILLION ___ from Pa. D.O.C. to Pa. State Police for safety equipment ___ ___

——— $15 MILLION from Pa. D.O.C. TO Volunteer fire companies

TOTAL $23 MILLION ___

$500,000.00, new elevator at Sci/Huntingdon __ Never USUED __

5. Now the issue that NO ONE in the Pa. Doc — Pa. state government TALKS ABOUT ___ the Pa. TAXPAYERS ARE NEVER TOLD ABOUT ___ ___

MONEY DAMAGES ___ taxpayers dollars, paid out of the Pa. Treasury for Unnecessary injuries caused by INCOMPETANT and ILL TRAINED STAFF. How much does this amount to for the LAST 10 YEARS?

ⓐ WILLIAMS V. SYED, 782 A2d 1090 (Pa. Comwlth 2001) (attached hereto)

$260,000.00 awarded to WILLIAMS for INCOMPETENT MEDICAL TREATMENT ___

SCI PITTSBURGH __ court mentions, MEDICAL CARE STINKS __

SCI HUNTINGDON __ court mentions, MEDICAL CARE STINKS ———

⑬

SCi Laurel Highlands is ALSO IN THIS GROUP — — —
about a year ago there was an inmate at
SCi Laurel Highlands — his last name was 'HAZEL'
(sic) (not sure of spelling)

$600,000.XX/XX (plus) awarded to HAZEL for INCOMPETENT
MEDICAL TREATMENT.
      I don't have the resources to get all the INFORMATION
on these issues, yet in 6 different instances —

$24,360.XX/XX (24 Million) of WASTE ! TAXPAYERS
DOLLARS.

Quotes
      In the attached article, "Managing the Twilight Years"
      " this is a prison of compassion — — praises their excellent
professionalism and caring attitudes — — — we treat them as we
would in any hospital — — the prison's medical facilities
are state of the art — — — " Yeh, $600,000.00/XX worth
of INCOMPETENCE at SCi Laurel/Highlands ALONE !

Are there any Taxpayers listening out there ?
Governor Rendell, are you listening ?

                          Richard Spytrak AF5977
                          SCi Laurel/Highlands
                                c/c

(14)

Ms. Linette Kowalewski, R.N.
Corrections Health Care Administrator
S.C.i. Laurel Highlands
5706 Glades Pike
P.O. Box 631
Somerset, Pa. 15501-0631

4-8-03

Richard Wojtysiak AF5977
SCi Laurel Highlands
5706 Glades Pike
P.O. Box 631
Somerset, Pa. 15501-0631
c/c    certificate of Mailing

63 copies

Dear Ms. Kowalewski, R.N.

I have attached hereto the MEDICAL APPROVALS (approved by DOCTORS AND MEDICAL PERSONNEL) for MY SPECIAL NEEDS-MEDICAL AND PSYCHOLOGICAL REQUIREMENTS — these MEDICAL APPROVALS date back as far as 1982 = 21 YEARS !  MY CHRONIC-INCUREABLE CONDITIONS date back OVER 21 YEARS ! These CONDITIONS DO NOT IMPROVE, they get WORSE !

    Due to my SPECIAL NEEDS (medical and psychological) I was Transferred to SCi Laurel Highlands on 5-21-02 from sci Huntingdon; to sci Smithfield, then to SCi Laurel Highlands. NOTICE :

SINGLE Cell --- This is just ONE of my SPECIAL NEEDS, I have been Housed in A SINGLE Cell for 28 YEARS ! (see attached documents).

MY SINGLE Cell (and other special needs) HAVE BEEN APPROVED BY   2 Chief Medical Officers Dr. Minor 1995, Dr. Reiners 3000 ; 1 Psychiatrist Dr. Wawrose 1981 ; 2 Corrections Health Care Administrators George Weaver R.N. 1998 ; P.A. Yarger R.N. 1998 ; Berel Arrow, M.D., D.O.C. 2002 .

EXF 63

①

When I arrived at SCI Laurel/Highlands, 5-21-02, I was placed on A Unit, AC5-4, DORMITORY HOUSING, 3 other inmates in cell with me. I could not eat right, I could not sleep right, I was ready to explode. I could not adjust to DORMITORY HOUSING.

On 9-12-02 I was moved to DA Unit, DA18-2, AGAIN DORMITORY HOUSING.

On 11-18-02 I talked to MR. WISER, Unit Manager of DA Unit, I explained to him that I just could not adjust to Dormitory Housing. I have tried for 6 months (5-21 to 11-18) I just can't adjust. I can not sleep or eat right, I feel like I am going to explode.

Mr. Wiser told me to lie low, he would get me into a single cell. (See also my request slip to Wiser).

On 12-19-02, Thursday, I was moved to a SINGLE cell on DA Unit, DA1-1.

On 2-19-03, Wednesday, MR. Wiser came to my cell, He was going to move me OUT of the SINGLE CELL AND BACK to DORMITORY HOUSING. I said he "need a single cell". Wiser told me to look at #4 or #6 cells. I told Wiser I could not move! It was 'MOVE' or 'MISCONDUCT' and go to the 'Hole'. I tell Wiser #4 cell and I needed someone to help me 'MOVE'.

(2)

About 10 minutes later the guard came to my cell (DA1-1) and told me that MR. WISER was on the phone and I did not have to move out of DA1-1 cell.

From 2-21-03 to 3-26-03, I have written request slips to DR. HABERMAN, psychologist AND MR. PINEDA, my counselor to see DR. HABERMAN ... with NO RESULTS.

MR. Comiskey the 'Mental Health Coordinator' told me they are going to TAKE MY SINGLE CELL. I requested to see DR. HABERMAN AND the PSYCHIATRIST about my psychological problems from DORMITORY HOUSING.

MR. Wiser has not talked to me since 2-19-03.

Attached 'MEDICAL APPROVALS' for my incurable, chronic, medical Conditions 'SPECIAL NEEDS' - MEDICAL - PSYCHOLOGICAL REASONS' - SINCE 1982

2 MATTRESSES
3 PILLOWS
1 ELECTRIC RAZOR
CANVAS SHOES
GROUND TIER CLEARANCE
MEDICALLY UNABLE TO WORK
SINGLE CELL

Wheelchair (cushions and Covers)
2 EXTRA PILLOWS

Medical
Approved
See attached B
Slips
Kowalewski C.
IS MEDICAL

(3)

CANE

KNEE BRACES - ELASTIC (2)

NORELCO (CORDED) ELECTRIC RAZOR

"are long standing + are necessary"

I have been told that my SINGLE CELL is going to be TAKEN FROM ME !

(See Wotten, K. V. Cuyler, 485 FSupp. 1288 (1979) et page 1294. also: Johnson V. Horn, 782 A2d 1973 (Pa. Cmwth. 2001) pages 1075 (1), 1076 )

Since SCI Laurel Highlands CAN NOT provide for my "SPECIAL NEEDS" - "MEDICAL" - "PSYCHOLOGICAL" (as per letter of May 4, 2001, from MR. Donald Williamson, Coordinator / Diagnostic + Classification, Bureau of Inmate Services, Pa. Dept. of Corrections - ATTACHED (also letter Sept. 10, 2001 ATTACHED) - then TRANSFER ME To ANOTHER institution - FACILITY a Level 2, Minimum Security Facility, I am classified by the Pa. Dept. of Corrections, as a Level 2 minimum Security inmate WHO CAN PROVIDE FOR ALL of my 'SPECIAL NEEDS'.

copies to:

MR. FREDRIC A. ROSEMEYER          MR. Jeffrey A. Beard DR.        Sincerely Yours,
SUPERINTENDENT                     Secretary
SCI Laurel Highlands               Pa. Dept. of Corrections
700 Globe Pike P.O. Box 631        P.O. Box 598
Somerset, Pa. 15501 - 0631         Campbell, Pa. 17001 - 0598

(4)

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**SCI-Laurel Highlands**
(814) 445-6501
April 14, 2003

**SUBJECT:**        Correspondence dated 4/8/03
Received 4/14/03

**TO:**        Richard Wojtczak, AF 5977
DA Unit

**FROM:**        Annette Kowalewski, RNC
Corrections Health Care Administrator

I am in receipt of the 4/8/03 dated correspondence.  No response is required by Medical as this is not a medical request.

Thank you.

AK:ts

cc:    File



*4-21-03 pw*

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**SCI-Laurel Highlands**
Superintendent's Office
(814) 445-6501
April 17, 2003

*(6)*

**SUBJECT:**   Correspondence

**TO:**     Richard Wojtcyak, AF-5977
        D A

**FROM:**    Fredric A. Rosemeyer
        Superintendent

*Single Cell Taken*

Responding to your correspondence to Ms. Kowalewski, CHCA, please understand that you are transferred here for personal care and housed on D-A Unit. You are in a single room temporarily and will remain there only until we need that room for an inmate that has a more serious medical condition.

The majority of Laurel Highlands is dormitory housing and if placed in a dorm, you will have to adjust just like many other inmates have had to do. You need to work closely with your Unit Management Team and adjust the best way you can to this Institution. If you are transferred to another institution, that transfer must come from the Department of Corrections, Central Office.

If you are having problems or concerns, please work with your Unit Management Team.

FAR:csd

cc:   Deputy Hunsberger, DSFM
     Mr. Wiser, Unit Manager
     Ms. Kowalewski, CHCA
     File

*I saw psychiatrist, I cannot "ADJUST" after 28 years in a SINGLE Cell !!! The psychiatrist understands this — the "Doc professionals DO NOT"!*

*64*



COMMONWEALTH OF PENNSYLVANIA
OFFICE OF INSPECTOR GENERAL

April 22, 2003

1400 SPRING GARDEN STREET
ROOM 101
PHILADELPHIA, PA 19130

Richard Wojtczak, #AF-5977
State Correctional Institution – Somerset
1600 Walters Mill Road BB-33
Somerset, Pennsylvania 15501-0631

    **RE:**   Your Correspondence to the Office of Inspector General

Dear Mr. Wojtczak:

    The Office of Inspector General has reviewed the information you provided in your March 18, 2003, letter regarding your concerns that the State Correctional Institute – Somerset erroneously commingles inmates of different security levels, fails to adequately treat your various medical conditions, refuses to transfer you to a minimum security prison, and searches your cell frequently. Based upon the information contained in your letter, the Office of Inspector General has determined that it does not have jurisdiction over the matter.

    The Pennsylvania Office of Inspector General has jurisdiction to "deter, detect, prevent, and eradicate fraud, waste, and abuse" in state agencies under the Governor of Pennsylvania's jurisdiction. The Office of Inspector General does not have jurisdiction to supercede the established procedures set forth by the Department of Corrections concerning the issues you raised in your complaint.

    The issues you raised in your letters are more appropriate for review by the Office of Professional Responsibility, Department of Corrections. You can contact the Office of Professional Responsibility at 2520 Lisburn Road, Post Office Box 598, Camp Hill, Pennsylvania 17001-0598.

    Thank you for contacting the Pennsylvania Office of Inspector General.

             Sincerely,

             Gabrielle J. Owens
             Office of General Counsel
       Assistant Counsel to Office of Inspector General

Richard Wojtyak AF5977
SCI Laurel Highlands
5706 Glades Pike
P.O. Box 631
Somerset, Pa. 15501-0631
c/c

Level 2, minimum security
facility — Medical
Psychological persons, Special
Needs.

Addressing the responses I am receiving to my letter-
request to Mrs. Anette Kowalewski, RNC, Corrections/Health
Care Administrator SCI Laurel/Highlands MEDICAL Dept.
(attached) dated 4-8-03.

This letter-request concerns my MEDICAL -
PSYCHOLOGICAL, SPECIAL, NEEDS and TRANSFER.

These responses have CompLETELY MiSUNDERStood
MY SPECIAL Needs. I will attempt to clear up these
MiSUNDERSTANDINGS, briefly for convience.

28 Years, BEFORE being TRANSFERRED to SCI
Laurel Highlands (on 5-21-02) I Pled NUMEROUS SPECIAL
NEEDS, MEDICAL and PSYCHOLOGICAL ... which are WELL
documented in my MEDICAL FILES. (NEEDS ARE CHRONIC)
These SPECIAL NEEDS MEDICAL, PSYCHOLOGICAL,
HAVE BEEN APPROVED. MEDICALLY APPROVED BY 2
Corrections Health Care Administrators • 2 Chief Medical Directors;
1 psychiatrist • 1 physician M.D. from D.O.C. central office —
MY SPECIAL NEEDS:

Ex 66

SINGLE cell • GROUND TIER CLEARANCE
MEDICALLY UNABLE TO WORK • CANVAS SHOES,
ELECTRIC RAZOR; 3 PILLOWS • 2 MATTRESSES;
WHEEL CHAIR • CANE • KNEE BRACES - ELASTIC (2)

(1)

(ALL Listed in my Medical Files).

I have CHRONIK, degenerating bone disease in BOTH KNEES, hips and spinal disc. This disease getting progressively worse, now confines me to a WHEEL CHIR with constant pain.

Because of this disease, along with other medical conditions, I was transferred to Sci Laurel/Highlands (5-21-02). The rationale for my placement at Sci Laurel Highlands was based upon me REQUIRING SPECIAL NEEDS, MEDICAL ~ PSYCHOLOGICAL (See letters from Donald Williamson, Bureau of Inmate Services, Pa. Dept of Corrections central office DATED 5-14-01 9-10-01, 3-25-03. Diana G Barey, Superintendent assistant DATED 9-6-01 (attached); Fred R Maue, M.D., Chief of Clinical Services, Bureau of Health Care Services, Pa. Dept of Corrections, central office DATED 3-28-03 (attached).

I have been HOUSED in A SINGLE Cell FOR 28 YEARS Due To Psychological Problems — See P.A. YARGER, R.N. CHCA DATED 1-9-96 George Weaver, R.N. CHCA DATED 4-23-98, 4-8-98 Dr Minor DATED 3-1-95 Dr. Riemers DATED 9-14-2000 (all approval letters ATTACHED).

A SINGLE Cell; MY BEING HOUSED in A SINGLE Cell is ONE OF MY SPECIAL NEEDS!

②

A SPECIAL NEED which is MEDICAL-PSYCHOLOGICAL!

When I arrived at SCi Laurel/Highlands I was placed in DORMITORY HOUSING (5-21-02), this DORMITORY HOUSING caused me SEVERE PSYCHOLOGICAL PROBLEMS --- I could NOT EAT Right; I could NOT SLEEP RIGHT; TREMENDOUS STRESS; my thoughts were SCRAMBLED; difficulty THINKING STRAIGHT; difficult for me to even FUNCTION.

I COULD NOT ADJUST
TO DORMITORY HOUSING!!!

OBViously, the SPECIAL NEED of a SINGLE Cell, I required this SPECIAL NEED of a Single Cell EVEN before I arrived at SCi Laurel/Highlands 28 YEARS BEFORE!!!

On 12-19-03, I was placed in a SINGLE Cell on DA unit - DA 1-1.

Now, On 4-24-03 my SINGLE Cell is being TAKEN FROM ME! (other inmates have Single Cell!)

It is now clear that SCi Laurel/Highlands CAN NOT PROVIDE FOR MY SPECIAL NEEDS - one of them being a SINGLE Cell!!

③

I am therefore ReQuesTING A TRANSFER to a Minimum, Level 2 Facility, which CAN PROViDe For ALL of MY SPeciAL NeeDs INcluDinG A SiNGle Cell!

Please do NoT twist the ISSUE  _ _ _ _

1. sci Laurel/Highlands IS To PROViDe for the "MediCAL - PSYCHOLOGICAL - AND SPeciAL NeeDs" of iNMATes _ _ as per Donald Williamson, Coordinator/Diagnosis & Classification, Bureau of Inmate Services, Pa Dept. of Corrections Central Office, Camp Hill Pa. letter DATeD 5-14-01; (09-10-01 attached)

2. _ I am TRANSFERReD to sci Laurel/Highlands 5-21-02 Because of MY SPeciAL NeeDs (see Memo Diana G. Baney DATeD 9-6-2001 attached).

3. _ MY SPeciAL NeeDs (MeDiCAL - PSYCHOLOGICAL) EXTeNDiNG BACK 28 years AND MediCALLY APProueD _ SiNGle Cell · GRouND TieR cleARANCe · MeDiCALLY UNABLeToWoRK · CANVAS Shoes · ELecTRic RAZoR · 3 Pillows · 2 MATResses · WheelchAiR · CANe · KNee BRAces ELASTic (2) (See attached and my MeDiCAL FiLE)

(4)

4. _____ SCi Laurel Highlands is TAKiNG MY SiNGLE
Cell (4-24-03) ONE of MY SPECiAL NeeDS (2-19-03)
(see letter from FREDRiC A. Rosemeyer DATED 4-17-03
attached)

**❋** Which other of MY SPECiAL NeeDS (see #3 above), WiLL
Laurel Highlands TAKE NexT ???? ... my Wheelchair?
My KNee BRACES? MY CANVAS shoes? ALL of MY
SPECiAL NeeDS ???

(see also: DOC policy statement #11.2.1 MAN 3 #6.5.14,
"Z" code SiNGLE cell HousiNG) (attached)

If necessary, please forward this LeTTer - ReQuesT -
(TRANSFER) to ALL "APPROPRiATe MEDiCAL STAFF AND STAFF"
for MY TRANSFER to a Minimum Security facility
which CAN PRoviDe FOR MY MEDiCAL & Psychological -
SPeciAL NeeDS.

s/ Richard Stotzel

Copies To:

See Attached

⑤

COPIES TO :

Dr. Jeffery A. Beard, Ph.D.              MR. FREDRIC A. ROSEMEYER
Secretary                                SUPERINTENDANT
Pa. Dept of Corrections                  SCi Laurel / Highlands
P.O. Box 598                             5706 Glades Pike P.O. Box 631
Camp/Hill, Pa. 19001-0598               Somerset, Pa. 15501-1631


Dr. Fred R. MAUE, M.D.                   also To:
Chief of Clinical Services               MS. SINES - counselor
Bureau of Health Care Services
Pa. Dept of Corrections
   P.O. Box 598
Camp/Hill, Pa. 19001-0598

       Jawad   Salameh
DR. Jawad Salameh, M.D.
Medical Director
SCi Laurel / Highlands
5706 Glades Pike
 P.O. Box 631
Somerset, Pa. 15501-0631


MR. DONALD WILLIAMSON
COORDINATOR/Diagnosic & CLASSIFICATION
BUREAU of INMATE SERVICES
Pa. Dept of Corrections
   P.O. Box 598
Camp/Hill, Pa. 19001-0598

⑥



**POLICY STATEMENT**
**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: | Policy Number: |
|---|---|
| REASONABLE ACCOMMODATIONS FOR INMATES WITH DISABILITIES | DC-ADM 006 |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| June 28, 1999 | *Martin F. Horn* | August 16, 1999 |

## I. AUTHORITY

The authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. PURPOSE

The purpose of this document is to establish policy and procedure regarding reasonable accommodations for disabled inmates who qualify under the Americans with Disabilities Act (ADA).

## III. APPLICABILITY

This policy is applicable to all Department of Corrections employees, contract staff, and inmates.

## IV. DEFINITIONS

### A. ADA

The Americans with Disabilities Act (ADA) is a comprehensive civil rights law for people with disabilities. The Act prohibits a "public entity" from discriminating against a "qualified individual with a disability" because of that individual's disability.[1]

---

[1] Federal Register, Vol. 56, No. 144, Friday, July 26, 1991 (28 C.F.R. §35.102)

pyromania, psychoactive substance abuse disorders resulting from current illegal use of drugs, the current use of illegal drugs, homosexuality or bisexuality.[4]

### G. Essential Job Function

The fundamental job duties of the position the individual with a disability holds or seeks. The term essential function does not include the marginal functions of the position.

### H. Facility ADA Coordinator

XX The Facility Health Care Administrator will serve as the Facility ADA Coordinator for reviewing ADA claims submitted by inmates.

### I. Major Life Activities

Means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.[5]

### J. Physical or Mental Impairments (which affects a major life activity)

Physical impairments include physiological disorders or conditions; cosmetic disfigurement; or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs (which would include speech – organs that are not respiratory such as vocal cords, soft palate, tongue, etc.); respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine.[6]

XX Specific examples of physical impairments include orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, HIV disease (symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism.[7]

Mental impairments include mental or psychological disorders, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.[8]

### K. Qualified Individual with a Disability

An individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility

4 ADA Title II Action Guide (28 C.F.R. §35.104)
5 ADA Title II Action Guide (28 C.F.R. §35.104)
6 Department of Justice Code of Federal Regulations reprint (28 C.F.R. §36.104)
7 Department of Justice Code of Federal Regulations reprint (28 C.F.R. §36.104)
8 Department of Justice Code of Federal Regulations reprint (28 C.F.R. §36.104)

## VI.  PROCEDURES

### A. Facility Placement

#### 1.  Facility Placement[13]

In addition to all other factors considered by the Department in making facility assignments of inmates, consideration may be given to facilities and programming available at various facilities to accommodate an inmate's particular disability(s).[14]

#### 2.  Community Corrections Center Placement

In addition to all other factors considered by the Department in making assignments of inmates for Community Corrections Placement, disabled inmates who are accepted for Community Corrections Placement, shall be placed in Community Corrections Centers or contracted facilities that provide accommodations according to the individual needs of the inmate.

#### 3.  Transfers

The sending facility is responsible for material submitted requesting the transfer of disabled inmates from one facility to another.  Clear indication that the inmate is disabled and the proposed level of accommodation and resulting services needed must be included.[15]

#### 4.  Request for Accommodation

a. An inmate who has a disability that he or she believes is not being reasonably accommodated by the Department shall submit a written request for accommodation on form **DC-135A, "Inmate's Request to Staff Member"** to the Facility ADA Coordinator or designee.

b. The **DC-135A** must include the inmate's specific disability(s) and the specific accommodation or service the inmate seeks.

c. The Facility ADA Coordinator or designee shall evaluate the request, assess the claim for medical validity, evaluate the inmate's needs (if any), and recommend accommodations that may be necessary.

d. The Facility ADA Coordinator will submit the recommendations to the Facility Manager and the Regional Deputy Secretary for final determination.  The safety and security of the inmate and the security of the facility will always be the overriding concern.

---

13 ACA Standard ACI 3-4360
14 ACA Standard 3-ACRS-4A-01, 3-ACRS-5A-01
15 ACA Standard ACI  3-4360



## IX.  RELEASE OF INFORMATION AND DISSEMINATION OF POLICY

### A. Release of Information

#### 1. Policy

This policy document is public information and may be released to members of the public, staff, legislative, judicial, law enforcement and correctional agencies and/or inmates upon request.

#### 2. Procedure Manual (if applicable)

The procedure manual for this policy is not public information and shall not be released in its entirety or in part, without the prior approval of the Secretary of Corrections or designee.  This manual or parts thereof, may be released to any Department of Corrections employee on an as needed basis.

### B. Distribution of Policy

#### 1. General Distribution

The Department of Corrections' policy and procedure manuals (when applicable) shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis. Distribution to other individuals and/or agencies is subject to the approval of the Secretary of Corrections or designee.

#### 2. Distribution to Staff

It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures.

## X.   SUPERSEDED POLICY AND CROSS-REFERENCE

### A. Superseded Policy

#### 1. Department Policy

08.02.18, Americans with Disabilities Act of 1990 , issued June 17, 1996 by Secretary Martin F. Horn

#### 2. Facility Policy and Procedure

This document supersedes all facility policy and procedures on this subject.

Case 1:01-cv-01163-SHR Document 30-2 Filed 01/21/2004 Page 86 of 100

No ADA at

# REGIONAL NEWS

## 3rd Circuit Rules That ADA Applies to State Prisons

*Becker Finds ADA, Rehabilitation Act Cover Prisons*

**BY SHANNON P. DUFFY**
*U.S. Courthouse Correspondent*

The Americans with Disabilities Act applies to state prisons, the 3rd Circuit Court of Appeals ruled yesterday in a decision that revived a lawsuit brought by a man who was denied admission to a boot camp program due to his history of hypertension.

In a case of first impression for the 3rd Circuit, Judge Edward R. Becker found that the text of Title II of the ADA and its predecessor — Section 504 of the Rehabilitation Act — was intended to cover prisons.

While the Rehabilitation Act applied only to federally funded government "programs or activities," the ADA extended that coverage to all government programs regardless of funding, Becker said.

Becker found that similarly broad language had been used in both laws that could only be read to include prisons.

The Rehabilitation Act states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."

### ALL-ENCOMPASSING DEFINITION

Becker said the statute's definition of "program or activity" was "intended to be all-encompassing" and explicitly found "all of the operations of ... a department, agency, special purpose district or other instrumentality of a state or of a local government ... any part of which is extended federal financial assistance."

Based on that wording, Becker said, the ADA "it is hard to imagine how state correctional programs would not fall within this broad definition."

Regulations promulgated under Title

II of the ADA, he said, "afford similar protections to persons with disabilities who are incarcerated in prisons ... regardless of the public institution's receipt of federal financial assistance."

Those regulations explicitly say the ADA covers "all services, programs, and activities provided or made available by public entities," Becker said, evidencing a "desire on the part of Congress that the ADA "apply to anything a public entity does."

Becker also found that "the weight of judicial authority" was on his side, with the 7th Circuit Court of Appeals holding that a blind prisoner had the right to sue over exclusion from prison programs and facilities, and the 9th and 11th Circuits following suit in holding that state prisons are covered by the ADA.

Two circuits, the 4th and 10th, have questioned the applicability of the ADA to prisons, Becker said, but "these opinions are seriously flawed."

In *Torcasio v. Murray*, the 4th Circuit found that the operation of prisons is a "core state function" and that because

neither Section 504 nor Title II includes an express statement of its application to correctional facilities, it was doubtful that Congress had "clearly" intended either statute to apply to state prisons.

But Becker said the *Torcasio* court has engaged in an "unwarranted ... extension of the clear statement rule."

### 'UNEQUIVOCAL EXPRESSION'

"Both the ADA and the Rehabilitation Act, he said, contain an "unequivocal expression of congressional intent to overturn the constitutionally guaranteed immunity of the several states."

In light of the "clear and all-encompassing language of both statutes," Becker said, "there is no basis for requiring Congress to have detailed which of the many important components of state and local governments were to be included in the terms 'any' and 'all.'"

*(Copies of the seven-page opinion Veskey v. Commonwealth, PICS No. 1514, are available from The Legal Intelligencer. Please refer to the Pennsylvania Instant Case Service Order Form found on Page 8.)*

Would you...

---

**Local Drug Manufacturer Sued Over Diet Pill Hazards**

... not recommend mixing the drug with other weight-loss medicines.

The lawsuit said drug makers "have



*Graterfriends*

It is time to mend relationships we destroyed, and the NAACP is a step in the right direction. It is one of few organizations concerned about prisoners and allowing them to be members. It is trying to unite prisoners' families; improve our communities; improve our living conditions in prison; and educate us about the importance of voting. So I encourage prisoners to support the NAACP through their presence, ideas, participation, time, and donations. To start an NAACP branch or to assist the NAACP in accomplishing its goals, contact Darnell Drinks, President, NAACP Graterford Branch, P.O. Box 2444, Graterford, PA 19426.

*Aaron Christopher Wheeler BZ-2590, SCI-Graterford*

As always, thank you for the wonderful job you are doing, not only to inform, but also to give all of us a place to voice our opinion, ideas, and complaints.

*Anthony Yang AS-3910, SCI-Somerset*

With construction nearing completion, SCI-Laurel Highlands soon will accept more prisoners. They will be asked to come here to work or to get closer to home. Think twice about coming here! We are treated like level 5 prisoners, subject to search at each meal and shake-downs by the team from hell. Intimidation, scare tactics, and threats are normal. Kitchen workers are forced to stay at work for the full 8 hours, even if not working and are not allowed the simplest reading material. Retaliation is immediate for any argument or questioning of orders. This is a work camp. You work or ship out. Our recreation dept. is worthless.

I witnessed nurses mistreating the elderly. The law library is inadequate. A double perimeter fence with high tech sensors surrounds our yard, and a roving vehicle drives around in circles 24-7. but the slightest bit of fog cancels yard. The moment you try to file something, you are harassed or shipped far from home. Think twice about coming here, its no way to do time.!

*Name withheld by editor, SCI-Laurel Highlands*

I lost my father, 79, unexpectedly this spring. He and Mom stood by me my whole life - even during the last 19 years in prison. I will always treasure the time we shared together, which now seems too short. I was unable to go to the funeral– not because of money, but because of policy. Since Dad died on a Saturday, no one could be notified until Monday, and then the sheriff wanted $1,700 by 4 p.m. Monday. Also because they were not notified until Monday, the sheriff said there was no time to plan for my trip to the funeral home because I'm so far away.

However, what the sheriff would have done wasn't worth any money. He would have given me a night in the county jail and some time (handcuffed) alone with my Dad only—no family, no time at the cemetery, nothing. They did not consider I have been in jail for 19 years, and am maxing out in a year, or that this summer I should be in a halfway house this summer (post-minimum pre-release).

While I'm not mad or bitter, I am sad that the sheriff has no plans in place for this need - particularly, no weekend phone number. Something must change. Since no one knows when they will die, the system must change. Change also is needed, because longer sentences make it more likely close family death will enter a prisoner's life. At such a time we should be allowed to grieve and heal with family.

*William Thomas Skinner AM-8585, SCI-Waymart*

I hope to find others in my situation. In 1996 I committed a homicide due to a violent reaction on Prozac, an anti-depressant. Because of lack of research at the time, I

was advised to plead guilty to murder-three. However, since my incarceration I found numerous studies and books on the dangers of anti-depressants such as Prozac, Zoloft, Paxil, and Welbutrin. These studies concluded suicide and violence can be caused by these medications especially in Manic Depressed people. One of the shooters at Columbine High School was on an anti-depressant. If you too have had a similar reaction to one of these drugs or have information to help me please contact me to exchange information.

*Kurt Danysh DL-4879, SCI-Frackville*

Here, about 1100 prisoners get a haircut about every 28 days. Also, 60 staff members get haircuts twice a month. Imagine 120 monthly haircuts given while "on the clock" at a street value of about $10. That is $14,400 a year. Now consider six barbers being paid 42-cents/hour for six hours/day, or about $50.00/month ($3,600/year). This is not fair! It's involuntary servitude. Though incarcerated, we barbers still must maintain our state license and fees, as well as other barbering items. In a community the size of this prison a barber sure could use that $14,400 to feed and clothe a child. We should not give such a financial break to someone who earns three or more times minimum wage as starting pay! Wake up, society! This is criminal.

*Name withheld by editor, SRCF-Mercer*

I'm not a very religious person, but I believe there's a God. Last spring, I listened to a sermon by Bishop David Evans. I can only describe it as being electrifying. I recently learned he is on the radio every Sunday at 7:00 a.m. on 91.3 FM, and 9:00 a.m. on 990 AM on Sunday, and live at noon on 1110 AM. I was once told that when you receive something good pass it on.

*Kevin Everett BF-3380, SCI-Graterford*

## HUGS
*by Jeannette Branham #28388, Corona, CA*

It is wondrous what a hug can do.
A hug can cheer you up when you are blue.
A hug can say "I love you so" or
"Gee, I hate to see you go.
A hug is "Welcome back again" and
"Great to see you, where have you been?"

A hug can soothe a small child's pain,
And bring a rainbow after rain.
The hug, there is just no doubt about it.
We could scarily live without it.
A hug delights and warms and charms,
It must be why God gave us arms.

Hugs are great for fathers and mothers.
Sweet for sisters, swell for brothers.
And chances are your favorite aunts,
Love them more then potted plants.
Kittens crave them, puppies love them.
Heads of state are not above them.

A hug can break the language barrier,
And make your travels so much merrier
No need to fret about your store of them.
The more you give, the more there's more of 'em.
So stretch those arms without delay,
And give someone a big hug today.



# Managing the Twilight Years

## Prison Specializes in Treating the Elderly and Disabled

› by Becky Beane

A few months ago a Pennsylvania prisoner died suddenly in the middle of his dialysis treatment. Patients hooked up to the other eight dialysis machines watched in shock as medical staff rushed in to try to revive him—with no success. Some of the onlookers started to weep, in a rare display of feelings for prisoners. And almost immediately, prison counselors and chaplains arrived to offer comfort and presence.

"This is a prison of compassion," describes Fredric Rosemeyer, superintendent of the State Correctional Institution at Laurel Highlands. It's also a respected pioneer in the specialized care of elderly and severely disabled prisoners.

Laurel Highlands opened in July 1996, converted from a state mental hospital in Somerset, southeast of Pittsburgh. Most of the hospital nursing staff stayed on, equipped with several weeks of instruction from the corrections training academy and on-the-job experience at other prison facilities. Rosemeyer praises their excellent professionalism and caring attitudes.

Jan Kowalewski, a registered nurse, says, "We don't have access to the men's criminal jackets; these charts are strictly medical charts. We treat them as we would in any hospital, regardless of what they've done."

But Rosemeyer reminds them not to forget that this is a prison, with strict security requirements. Staff must account for every needle, every drug, and piece of equipment. Serious disciplinary problems can lead to a prisoner's solitary lockdown.

But that seldom happens. Even in the general-population unit (Laurel Highlands also houses younger prisoners, who do much of the physical labor), the older inmates "are more subdued," says Deputy James Henderson. "They have a stabilizing effect on the younger population."

Expected to house 1,300 prisoners when the renovations are completed, Laurel Highlands now holds about 350.

To help ease the bleakness, every prisoner receives a personal treatment plan, designed and reviewed every 90 days by a team of educational, medical, psychological, chaplaincy, and activities staff. For some "it's a plan to make it through each day. We don't want them to just sit in a room and die."

The prison's medical facilities are state of the art—and highly cost-effective. Without the dialysis unit, for example, up to 40 prisoners with kidney problems would have to be transported—under guard—to the local hospital for treatments three times every week. Treating the patients right there in prison saves Pennsylvania taxpayers millions of dollars in medical, transportation, and security costs.

Laurel Highlands—like a growing number of prisons—also takes advantage of tele-med, closed-circuit TVs that allow interaction between the prisoner-patient and doctors at participating hospitals.

Medical staff offer some unique resources to help disabled inmates become more independent. A long-handled instrument with clippers at one end (plastic so it can't be used as a weapon) enables arthritic inmates



to put on their socks. Strips of wide elastic allow them to exercise arm muscles in place of weights. Some come for "hot wax" treatments to soothe and revive crippled joints.

A crew of chaplains helps soothe and revive crippled spirits. Says head chaplain Elizabeth Scott: "We would [for inmates] ... to observe ... it we were able to ... to help them see themselves with value and worth—as God sees them."

Mike Ellicson

Additional Vindictive – Retaliatory-
Harassing "Misconducts", Threats of 'misconducts'
and an overabundance of unnecessary
Searches – – – –

Also, prior to Misconduct A472303, 10-18-01 by C.O,
R.McCall – – – – – plaintiff Richard Stoptzyak
recieved another "Misconduct" from Sargt. Harris
for failing to "STAND FOR COUNT"!
Plaintiff's knees, hips, hurt so bad he could
NOT STAND FOR COUNT both these "Misconducts"
issued at SCI Huntingdon.
Also plaintiff's Disabilities ignored! –
"Misconducts' not referred!

Plaintiff receiving 'Misconducts' because of his Disabilities
with No recourse for plaintiff.

Excessive SEARCHES of ONLY the plaintiff – who is
classified as a MINIMUM SECURITY INMATE" "Housed AT
A 'MINIMUM SECURITY FACILITY'.

EK
91

**1288**   480 FEDERAL SUPPLEMENT

ages, totaling over 2½ million dollars, which arose from the crash of a Braniff flight near Falls City, Nebraska. Several parties were named as defendants. Then Chief Judge Campbell recognized the intention of the defendants had for delay and the losses that this delay would occasion for plaintiffs. He concluded that, since the defendants, they should not be made to benefit for payment while the defendants determined which of them was liable. Accordingly, he ordered the defendants to deposit with the court a sum equal to the estimated amount of damages in all the cases. As the damages were determined in each individual case, payment was made to the plaintiffs from this fund. The effect of Judge Campbell's order was to relieve the defendant and final recovery of damages.

Judge Campbell's innovative decision in Kenney illustrates the ability of federal courts to develop procedures to prevent determined. The amount of damages to which they are entitled? His creation of a damage fund is, however, the only method a court can use to insure fair and expeditious disposition of litigation of this type. By including prejudgment interest as part of the damages, the same goals can be achieved.

**IV.**

Although we conclude that prejudgment interest is available in these cases, we cannot grant summary judgment action for plaintiff's claim for prejudgment interest in *Kalmi v. McDonnell Douglas Corp.*, No. 70 C 2272. Prejudgment interest is awarded only to prevailing plaintiffs. We cannot grant summary judgment on the issue of prejudgment interest in this case only if we granted summary judgment on the underlying issue...

*footnote:* 12. ...ount ordering the establishment of a damage fund in these cases, we have suggested...

issues of liability and damages. See *Triangle Ink & Color Co. v. Sherwin-Williams Co.*, 64 F.R.D. 536, 537 (N.D.Ill.1974). Without knowing the date of final disposition or the amount of damages to which any plaintiff is entitled, we cannot calculate the amount of prejudgment interest, if any, which such plaintiff should recover. We therefore deny plaintiff's motion for summary judgment on her claim for prejudgment interest as an element of damages in all instructions to juries or in calculating damages in any bench trials.

An appropriate order will enter.

inmate could not be required to renounce his right to receive general protection from the tend religious services. U.S.C.A.Const. other inmates as a condition of receiving opportunities afforded to prisoners in the general population.

Order in accordance with opinion.

---

**WOTCZAK v. CUTLER**   **1289**
Cite as 480 F.Supp. 1288 (1979)

Richard WOTCZAK, Plaintiff,
v.
Julius T. CUTLER, Individually and in his official capacity as Superintendent at the State Correctional Institution at Graterford et al., Defendants.

Civ. A. No. 76-3087.

United States District Court,
E. D. Pennsylvania.

Dec. 6, 1979.

As Amended Dec. 21, 1979.

**1. Injunction ⟨=⟩22**
Voluntary cessation of allegedly illegal practices does not moot claims for injunctive relief.

**2. Prisons ⟨=⟩4(2)**
Court is obligated to defer to decisions of prison officials on matters of security unless substantial evidence shows that they have exaggerated their responses to the perceived security problem.

**3. Civil Rights ⟨=⟩13.13(1)**
In order to be entitled to relief in an action brought under section of Civil Rights Act governing civil actions for deprivation of rights, plaintiff must establish that he has been deprived of rights secured to him by Constitution and laws of United States. 42 U.S.C.A. § 1983.

**4. Prisons ⟨=⟩4(14)**
Prisoners must be afforded reasonable opportunities to exercise religious freedom guaranteed by First and Fourteenth Amendments. U.S.C.A.Const. Amends. 1, 14.

**5. Prisons ⟨=⟩4(14)**
A restriction on free exercise by prisoners of their religion is deemed reasonable only if it is the least restrictive alternative on discipline. U.S.C.A.Const. Amends. 1, 14.

**6. Prisons ⟨=⟩4(14)**
Where no substantial security consideration existed for precluding long-term prison inmate, who was segregated in a maximum security housing unit at his own request for his own protection, from receiving regular visits from a prison chaplain and receiving communion or mass in his own faith at least as frequently as prisoners in general population

**7. Prisons ⟨=⟩4(13)**
In light of justifiable security considerations, long-term prison inmate, who was segregated in a maximum security housing unit at his own request for his own protection, was not entitled for his own protection, was entitled to have afforded person— was entitled to have legal material provided to him in his cell and also entitled to have his opportunity to do legal research be at least the equivalent of the opportunity that was available to inmates who were permitted to go personally to prison law library.

**8. Convicts ⟨=⟩7(1)**
Long-term prison inmate, who was segregated in a maximum security housing unit at his own request for his own protection, was not entitled to be given idle pay when he was not working where general prison population was given opportunities to engage in remunerative employment or receive idle pay when work was not available.

**9. Convicts ⟨=⟩2**
Correctional authorities have an obligation to protect inmates from violence and assaults directed at them by other inmates. U.S.C.A.Const. Amends. 8, 14.

**10. Prisons ⟨=⟩4(5)**
By exercising his Eighth Amendment right to be protected from violence and assaults directed at him by other inmates, long-term prison inmate, who was segregated in maximum security housing unit at his own request for his own protection, did not waive his right to receive opportunities and benefits afforded to prisoners in the general population. U.S.C.A.Const. Amend. 8.

**11. Prisons ⟨=⟩4(5)**
Prison authorities may not condition rights, privileges, or opportunities of a prisoner who is objectively in danger of violent...

**1290**    **480 FEDERAL SUPPLEMENT**

Persons ⚮4(5)

Absent valid security considerations of long-term prison inmate, who was objectively in danger of violent assault from other inmates and who was segregated in a maximum-security housing unit at his own request for his own protection, could not be required to renounce his right to reasonable protection from the other inmates as a condition to receiving opportunities afforded to prisoners in general population; thus, inmate was not entitled to attend educational classes in main prison building but was entitled to instruction by tutors and use of instructional materials in his cell and inmate is also entitled to a chair in his cell.

Prisons ⚮46

Scheduling of visits is within prison officials' discretion.

Prisons ⚮46

Long-term prison inmate, who was objectively in danger of violent assault from other inmates and who was segregated in his own security housing unit at his own request for his own protection, was not entitled to extension of hours of visitation, for reason that there was a valid security justification for the limited hours of visitation.

---

Edmund A. Tryzak, Community Legal Services, Philadelphia, Pa., for plaintiff.

Jerry J. Drew, Asst. Atty. Gen., Pennsylvania Dept. of Justice, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### 1. Preliminary Statement

This case raises the interesting question whether a long-term prison inmate segregated in a maximum-security housing unit at his own request for his own protection can nonetheless require prison authorities to afford him certain of the rights and privileges of inmates in the general prison population. For reasons which will in due course appear, we hold that, at least in some respects, he can.

Plaintiff is an inmate at the State Correctional Institution at Graterford, Pennsylvania (Graterford). In August, 1975, he was arrested on the aggravated morals charges described below and held in Montgomery County Jail in lieu of bail. The record indicates that at some point he spent a short time in Bucks County Prison. On February 26, 1976, following his conviction, he was transferred to Graterford. After expressing fears for his physical safety occasioned by the widespread publicity given his offenses, he was assigned to a housing unit known as the Behavioral Adjustment Unit (BAU).[1] The BAU is a maximum-security unit used to segregate from the rest of the population those inmates who are violent, mentally ill, or need protection. Plaintiff is now and for a long time has been assigned to the BAU for his own protection.

Plaintiff does not seek to be transferred from the BAU. To the contrary, he requests that we order his continued assignment to the BAU. Rather, he challenges in this suit the following conditions and privileges afforded him in his BAU-assignee: (1) the fact that his cell has not been equipped with a chair, desk, or table, although cells in the general population are so equipped; (2) the fact that he has not been provided with any program for rehabilitation, while inmates in the general population have been

provided with such programs; (3) his inability to leave his cell for more than one out of every twelve hours, although inmates in the general population are allowed more time out of their cells; (4) the fact that he has not been allowed to perform remunerative work, while inmates in the general population have been allowed such work; (5) the denial to him of the "idle pay" which is awarded to all inmates who are unable to work, except inmates like plaintiff who are confined in the BAU for their own protection; (6) the fact that he has been permitted to shower and shave only three times weekly, whereas inmates in the general population may shower and shave daily; (7) the denial of visitation rights equivalent to those afforded to prisoners in the general population; (8) the fact that he has not been permitted to attend weekly religious services of the Roman Catholic faith; and (9) the fact that he has not been permitted to do legal research in the prison law library.[2]

Plaintiff brought this action under 42 U.S.C. § 1983 for injunctive relief and damages[3] for alleged deprivation of his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution.[4] He has also claimed that defendants violated Administrative Directive 801 of the Pennsylvania Bureau of Correction. After discovery, plaintiff moved for a preliminary injunction. By stipulation of counsel, we have treated that motion in all respects as a motion for a permanent injunction, see Fed. R.Civ.P. 65(a)(2), and have held a final hearing. Plaintiff requests a permanent injunction ordering defendants to permit him to

---

1. were informed at the hearing in December, 1978 that the name of this unit was recently changed from housing "Unit" at some time prior to hearing. However, since the time of the events here in question continued, for the most part, to refer to the unit ...

2. Although plaintiff's claim relating to access to the Graterford law library was not alleged in his Amended Complaint, extensive evidence on that issue was adduced at the hearing, without objection, and both parties have addressed the issue in their memoranda of law. Consequently we treat the pleadings as amended to conform to the evidence. Fed.R.Civ.P. Rule 15(b).

In his Amended Complaint, plaintiff also alleged deprivations in lighting, provision of hot water, ventilation, provision of hygienic materials, permission to keep matches in his cell, permission to smoke a ... at meals, permission to smoke a pipe, and permission to tape materials onto cell walls. He also alleged that medical treatment

---

attend weekly religious services; to allow him to visit the law library; to attend educational programs; and to receive visitors at the same times and with the same frequency as prisoners in the general population; to assign him remunerative work on the same terms as inmates in the general population; to award him "idle pay" when work is unavailable; to permit him to shower and shave daily; to furnish his cell with a desk and a chair; and to maintain his security by continuing to assign him to the BAU.

In terms of legal theory, plaintiff argues that he has been denied the constitutional rights of the free exercise of his religion and of meaningful access to the courts because he has been deprived of personal access to communal religious services in the prison chapel and to the prison law library. He argues that he has been deprived of equal protection of the laws in that other inmates enjoy greater rights and privileges than he does. He claims, further, that the denial to him of rights and privileges which other inmates enjoy violates Administrative Directive 801 of the Pennsylvania Bureau.

In addition, plaintiff makes the following argument bottomed on the Eighth Amendment's proscription of "cruel and unusual punishment." He contends that since his removal to the BAU, defendants have an objective basis for his safety; that defendants recognized have a constitutional duty, included within the Eighth Amendment, to exercise reasonable care to protect him from violence directed at him by other inmates, and that while they have discharged that duty by assigning him to the BAU, they have improperly conditioned

---

3. This opinion and the accompanying order address only plaintiff's claim for injunctive relief. His claim for damages is not presently before ...

4. Concomitantly, jurisdiction is founded on 28 U.S.C. § 1343.

**1292**

his enjoyment of the opportunities, rights, and privileges available to inmates in the general population on renunciation of his Eighth Amendment right to protection. We refer to this as plaintiff's unconstitutional conditions claim.

Defendant Cuyler is the Superintendent of the State Correctional Institution at Graterford. The other twenty defendants are prison officials, members of the medical and psychological staff, and guards at Graterford. Defendants submit that plaintiff's fear for his safety is a mere subjective belief, without an objective basis. Moreover, they note that plaintiff is free to enjoy the general prison population at any time, and then will enjoy all the opportunities, rights, and privileges of the inmates in the general population. They argue that by requesting confinement in the BAU, plaintiff has waived those opportunities, rights, privileges, and in any event, that the treatment afforded him during his confinement in the BAU meets all constitutional minima. Defendants also take issue with certain of plaintiff's factual allegations concerning the opportunities afforded prisoners in the general population.[?] They argue that the separate treatment of plaintiff is necessary for the maintenance of prison security. And finally they disagree with plaintiff's application of constitutional theory.

We have found this to be a difficult and troubling case, in which the arguments of both the plaintiff and the defendants have considerable appeal. Upon analysis and reflection, and for reasons that will appear in part III of this opinion, we have deter-

---

mined that plaintiff's Eighth Amendment argument is meritorious. While it has been a source of concern, we are satisfied that our conclusion accommodates fully the policy of broad deference to prison officials which was enunciated most recently in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In *Wolfish*, the Supreme Court held that courts must defer to the judgments of prison officials concerning the most recent conviction, we find that certain of the practices challenged in this action were the result of exaggerated responses to security considerations.

Our first task is to make findings of fact on the following matters: the nature of plaintiff's criminal convictions and attendant publicity; the general layout of the prison; the threats on plaintiff's life and his placement and retention in the BAU; the conditions of plaintiff's confinement in the BAU; and the security justifications for the challenged conditions. We will then turn to our discussion of the applicable law. This opinion constitutes our findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).

## II.  Findings of Fact

### A.  The Nature of Plaintiff's Criminal Convictions and Attendant Publicity

In August, 1975, plaintiff was arrested on charges of burglary, felonious restraint, cor-

---

ruption of minors, and deviate sexual intercourse. These charges were the result of complaints filed on behalf of eight young girls ranging in age from nine to thirteen years. He was subsequently convicted of the rapes of three of those girls. The first conviction was in Montgomery County, the second conviction was in Philadelphia, and the most recent conviction, in November, 1978, occurred in Bucks County. As a result of these convictions, plaintiff is serving a total sentence of forty to eighty years.

The publicity accompanying plaintiff's arrest and convictions was extensive. All the major Philadelphia daily newspapers and TV channels covered his arrest.[?] Plaintiff testified that the publicity made it necessary for his wife to be provided with police protection and for his son to be withdrawn from school.

Prisoners in the general population at Graterford have access to television, radio, and newspapers. It is highly probable, and not disputed in the record, that at least some inmates at Graterford knew of the nature of plaintiff's offenses.

### B.  The Prison Layout

Within the prison walls at Graterford there are three buildings: the main building, the powerhouse, and the BAU. The main building encompasses five cell blocks as well as the chapel, school, law library, and visitation room. The prison kitchen, auditorium, hospital, administrative offices, and industrial plant are also located in the main building. Inmates in the general population are housed in the five cell blocks. Cells remain unlocked between the hours of 6 A.M. and 4 P.M. and from 5 P.M. until 9 P.M., during which time the inmates are free to move about the cell block.

In the rear of the cell block is an area consisting of fifty cells separated from the rest of the block by cyclone fencing and a

---

**1293**

gate. This area is known as B-gallery. It houses those inmates who require closer security than is available in the general population. Inmates there are locked in their cells except for periods of recreation in the yard, meals in the dining room, medical treatment, and visits. B-gallery inmates have contact with each other during recreation and meals, and may also come in contact with the general population in moving back and forth from these places. B-gallery inmates are assigned work in B-gallery when available. Inmates who have committed themselves to B-gallery are permitted to go to the chapel and the law library, but are not escorted by guards if they choose to go there.

The BAU is located in a separate building and constitutes the most secure housing at Graterford. BAU inmates are locked in their cells approximately twenty-three hours per day. Meals are served to them in their cells, and the inmates are not in physical contact with one another during recreation periods in the yard. Prisoners in the BAU ordinarily leave the BAU building only to go to the visitation room in the main building, to see attorneys or other visitors. In such instances, inmates are taken from the BAU to the main building in a station wagon and are escorted by two guards.

The BAU houses three categories of inmates: (1) those assigned for disciplinary reasons; (2) those who are in protective custody; and (3) those who are there for their own protection. Plaintiff falls into this latter category. At the time of trial, three other inmates were housed in the BAU for their own protection. Superintendent Cuyler testified that this was a usual number of inmates lodged in the BAU for their own protection.

---

Footnotes (column 1):

Defendants also argue that plaintiff's claims for remunerative employment when available, and for de pay when employment is not available, are moot. Defendants provided plaintiff with a job shortly before the trial began. However, they have made no representations to the court or to the plaintiff that they will continue such an intention, plaintiff's claims would not be moot, because the voluntary cessation of allegedly illegal practices does not moot claims for injunctive relief. *United States v. Concentrated Phosphate Export Association*, 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); *Zwickler v. Koota*, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). Even if they had indicated when he is not employed. In fact, during the period between the second and second days of trial, plaintiff was separated by several weeks, which were downgraded plaintiff's employment from full-time to part-time. At the time of trial, plaintiff had not received any de pay based on the downgrad-

---

Footnote (column 3):

6. The crimes themselves and the police search for the perpetrator had been widely publicized. Indeed, just prior to or during plaintiff's most recent trial, a story appeared in the *Philadelphia Inquirer* reporting that plaintiff had been sentenced in Bucks County. We informed counsel of the contents of this article at a prehearing confer-

---

Footnote (column 4):

ence. We also heard at hearing that one of our law clerks had seen a television report of the story on our hearing. We read the *Philadelphia Inquirer* story, which highlighted plaintiff's status as a well-known former high school football star in Northeast Philadelphia.

## C. The Threats Upon Plaintiff's Life; His Placement and Retention in the BAU

Plaintiff's first incarceration was in Montgomery County Prison when he was awaiting trial. Plaintiff testified that while he was lodged there, other prisoners threw firebombs, burning newspapers, and cigarettes into his cell, and that many verbal threats were directed at him. He described these threats:

Well, these were prisoners, inmates. We'll get you. We can get you. They used the terms baby raper, child molester.

As a result, he was segregated from the other prisoners at Montgomery County Jail. Bucks County Prison, prior to transfer to Graterford, the word reached him through another inmate that there were prisoners that there threatened him. The word reached him that numerous attempts had been made on his life because of the nature of the crimes for which he had been sentenced, and that he was concerned about his physical safety at Graterford. He was then assigned to the BAU.

These occurrences formed the basis for defendants' claim that he did not request such placement. There is no dispute, however, that plaintiff does not now wish to remain there. Defendants point out and plaintiff concedes that he is free to go to B-gallery at any time. Defendants note that most self-protection cases are housed in B-gallery. Try time. The general population or to B-gallery, adequately protected in these areas where conflict among inmates is less restricted, and therefore chooses to remain in the BAU. Indeed, in May 1977 plaintiff was

removed from the BAU and placed in B-gallery. After approximately two hours on B-gallery, plaintiff requested the guards to return him to the BAU, and he was returned there. Plaintiff testified that during those two hours, he was threatened by prisoners in the main portion of "B" cell block, who called him by name and said that they could "get" to him. During that scant two hours, either those prisoners called plaintiff a "baby-raper" and "child molester."

Plaintiff also testified that he has been threatened even while in the BAU. He testified that he has heard prisoners in the yard call his name and threaten him with death. We credit that testimony. Plaintiff was thus subjectively in fear. We also find that there was an objective basis for the fear. Plaintiff were transferred out of the BAU, other prisoners would indeed be able to "get" to him. Moreover, plaintiff's contention that he has reason to fear for his safety was supported by the testimony of an expert witness.

Dr. Edward V. Guy, the Director of Psychiatric Services for the Philadelphia prison system, testified that the lowest status among prison inmates is generally reserved for persons convicted of sex crimes against children. He testified that he had found "a very active type of a threatening attitude" toward such inmates among other inmates, and that in the Philadelphia prison system, a person convicted of a sex crime against a child would "automatically" be housed differently from the general population. While other inmates there are housed in dormitories, sex offenders against children are housed initially in individual cells with some access to "the general population." Dr. Guy testified that, "almost invariably within a day or two ... once the threats become known ... the accused child molester," such offenders request transfer to a maximum security cell." We find Dr. Guy's

x. The reasons for this move were not revealed by the record.

testimony as to conditions and practices in the Philadelphia prison system, and the plaintiff's own testimony as to his own experiences in other prisons in Eastern Pennsylvania, to be probative of the reasonableness of plaintiff's apprehension of danger to his physical security at Graterford. See Withers v. Levine, 449 F.Supp. 473, 476 (D.Md.1978). Indeed, that apprehension was acknowledged by the defendants, who assigned plaintiff to the BAU in response to his expressed fears of physical assault by other inmates, and who have never attempted to transfer him from the BAU, with the possible exception of the two hours he spent in B-gallery.

## D. The Conditions of Plaintiff's Confinement in the BAU

The basis of plaintiff's complaint is the disparity between the opportunities and programs available to prisoners in the general population at Graterford, and the restricted opportunities available to him in the BAU. He presented evidence at the hearing of disparities in access to religious services, access to the prison law library, employment and idle pay, cell furniture, time out of lock-up, personal hygiene, and access to visitors. We consider each of these topics in turn.

### 1. Access to Religious Services

Inmates in the general population and in B-gallery are permitted to attend weekly religious services in the prison chapel, located in the main prison building. Plaintiff is a Roman Catholic who regularly attended Mass before his incarceration. During his confinement in the BAU, plaintiff has not been permitted to attend communal religious services.

Plaintiff has requested that defendants permit him to receive communion in the BAU once a week. He testified that a priest had visited him in the BAU only sporadically and had given him communion at times varying from approximately once a month to once every four months. Defendants state that although plaintiff is not permitted to attend services with other prisoners for security reasons, he may request daily chaplain visits and be given communion in his cell. Plaintiff testified that he was willing to accept chaplain visits in the BAU in lieu of being escorted to the prison chapel. We accept the parties' word on these points.

### 2. Access to the Prison Law Library

Prisoners in the general population are permitted to go to the prison law library, which is located in the prison school building, to do research. The library is open from about 8:30 or 9:00 a. m. to 11:00 a. m. from 1:00 p. m. to 3:30 p. m., and from 6:00 to 8:00 or 8:30 p. m. The library hours are the same as the hours of the prison school, of which it is a part. Staff members and guards are not on duty in the library or the school building during the hours when it is generally locked during those hours.

Plaintiff has not been permitted to go to the prison law library. A few months before trial, defendants began to provide plaintiff with photocopies of judicial opinions which he requests. These copies are often blurred, and plaintiff frequently has been told that the library does not have the cases which he requested. Plaintiff has not been permitted to meet with or obtain es-

cable kind of criminal.'" M.Pinero, Short Eyes, 128 (Hereinafter ed. 1975). Early in the play a sympathetic inmate tells the victim: "if I was you I'd ... ask ... transfer to protection cause ... if you remain on this floor you're asking to die ... You'll be committing involuntary suicide." Id. at 30.

Independently of this action, we have been assigned another case which suggests that plaintiff's fears are at least within the realm of reason. Pitorra v. Robinson, Civil Action

sistance from the paraprofessional law clinic at Graterford. Plaintiff has, however, stated through counsel that he is willing to accept the opportunity of doing legal research in the BAU in lieu of being transferred to the law library.

*D. Availability of Educational Programs*

The prison has a wide variety of educational programs available to inmates from Kindergarten to college level. According to Superintendent Cuyler, these programs exist to assist in the rehabilitation of inmates. Inmate's participation in educational programs is a factor in the determination whether he will be recommended for parole. Plaintiff has not been permitted to participate in educational programs with other prisoners outside the BAU. Moreover, he has never been offered the opportunity to receive education by means of correspondence courses and tutors in his cell, and has been unaware that such an opportunity existed. Defendants state, however, that while he is in the BAU, plaintiff may receive educational programs in the form of correspondence courses and tutors in his cell. A prison official testified that tutors have been permitted into the BAU in the past, and would not cause a security problem. We accept that representation. The plaintiff testified that he would be satisfied with having tutors and educational materials in the BAU in lieu of being escorted to educational programs with other inmates.

*E. Employment and Idle Pay*

Inmates in the general population at Graterford are permitted to perform remunerative work. Work is available to inmates to make them productive, to reduce idleness, and to facilitate rehabilitation. One factor in the prison's determination whether to recommend a prisoner for parole is his participation in, and success or failure at work programs. Inmates in the general population who are unable to work receive "idle pay." Furthermore, inmates in the BAU who are confined for disciplinary reasons or because they are mentally ill receive idle pay. Only inmates in the BAU who are

confined there for their own protection receive no idle pay.

During most of the time of his confinement in the BAU, plaintiff has not been permitted to engage in remunerative work, and has not received idle pay. Approximately two weeks before the first day of hearing in this case, plaintiff was given a job stripping down a section of the BAU which was being renovated. He worked along with two other inmates who were confined in the BAU for their own protection. They were issued sledge hammers, crow bars, hammers, and chisels. That job was for 8 hours a day, six days per week. Between the first and second hearings in this case, plaintiff was transferred from that job and assigned another job which required him to work only one day out of every three. Defendants have made no assurances to plaintiff that he will continue to receive remunerative work or idle pay.

5. *Cell Furniture*

Cells in the general population are equipped with a chair. Cells in one block out of the total of five are also equipped with a desk. Cells in the BAU, including plaintiff's, are furnished with neither a chair nor a desk.

6. *Other Disparities*

Inmates in the general population are permitted to leave their cells for at least ten hours per day. While confined in the BAU, plaintiff has been permitted to leave his cell for but one hour per day, except when he is working. During this hour, he is permitted to exercise alone outdoors.

Inmates in the general population are permitted to shower and shave daily. Except while he was working six days per week, plaintiff has been permitted to shower and shave only three times per week. While he was employed six days a week, plaintiff was permitted to shower and shave six times per week. Plaintiff's cell is equipped with a sink that he may use for washing.

9. This figure excludes guards assigned to the perimeter patrol, the vehicle lot, the pedestrian gate, and other locations outside the prison buildings.

10. By way of contrast, Superintendent Cuyler also testified that the doors of the BAU are opened "on a routine basis" to transport pris

All inmates are limited to one visit per week. Inmates in the general population are permitted to see visitors on holidays, evenings, and weekends. Inmates in the BAU, including plaintiff, are permitted to see visitors only on Saturday mornings. These limitations do not apply to prisoners consultations with their attorneys.

*E. Security Justifications for the Challenged Conditions*

[2] Defendants have asserted that the restricted opportunities afforded plaintiff are justified by security considerations. We are obligated by the recent decision in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), to defer to the decisions of prison officials on matters of security unless substantial evidence shows that they have exaggerated their responses to the perceived security problem. *See* discussion *infra.*

Plaintiff has testified that to insure his safety he needs an escort of two guards to accompany him to religious services and other programs where he would come into contact with other prisoners. Indeed, he has indicated that even if we order defendants to permit him to attend religious services and educational classes and to use the law library, he would not do so unless accompanied by a two-guard escort, because of fears for his safety. Defendants do not contest plaintiff's evaluation of the necessity of a two-guard escort, except for their blanket assertion that all plaintiff's fears for his safety are insubstantial, a contention which we have rejected. Accordingly, we accept plaintiff's testimony that he cannot safely be transported to programs where he would come into contact with other prisoners unless he is accompanied by two guards.

Defendants argue that giving plaintiff the required escort would compromise the

security of the institution as a whole by reducing the number of guards in the remainder of the institution. At no time are there more than 40 guards working within the institution.[9] Assigning a two-guard escort to plaintiff would reduce that complement by 5%, and might lead to an increased likelihood of escape, violence, pilferage, and vandalism in the institution. We find that defendants' response to this proposal has not been exaggerated, and we must defer to their judgment on the "escort" aspect of plaintiff's proposed relief.

Defendants argue further that the security of the BAU itself would be weakened if they had to open the doors frequently to transport plaintiff to programs which are conducted outside the BAU building. The chapel, prison law library, and prison school, all located in a separate building from the BAU building. Superintendent Cuyler testified that some of the most dangerous inmates in the entire state prison system are housed in the BAU, and that the BAU is concerned about the possibility of escapes.[10] We cannot and do not find that the defendants' concern for the risk to BAU building security that would be created by frequently transporting plaintiff from the BAU to the main prison building is exaggerated.

These problems—the weakening of BAU security and the weakening of total institution security caused by diversion of guards from other areas of the institution—would arise whenever plaintiff is transported from the BAU to a program in the main prison building where he would come into contact with other inmates. Since we have not found that the prison administrators' response to these problems is exaggerated, we must defer to their judgment. These security problems thus control our disposition of plaintiff's claims for personal access to com

oners to the visiting room, and another defense witness testified that the doors are opened "all the time." We cannot, however, find that the defendants' concern for the additional risk that would be created by transporting the plaintiff from the BAU to the main building is exaggerated.

12/21/2011
Page 94 of
63-SH
1-1-06
30
Case

munal religious services, personal access to the law library, personal attendance at educational classes, and work outside the BAU. Defendants contend also that a security risk would be created by opening the doors of plaintiff's own cell. Their concern for this risk is plainly exaggerated. None of the relief sought by plaintiff would require defendants to open any other prisoner's cell.

Defendants argue further that giving plaintiff privileges not enjoyed by other inmates in the BAU would increase resentment against him felt by the other inmates. Defendants have never presented a challenge that the BAU himself presents a security risk. To the contrary, they emphasize that he is free to rejoin the general population whenever he wishes.

Although Superintendent Cuyler testified in general terms that "we have an unwritten rule . . . that we try not to do for one inmate or any group of inmates something that we can't do for our entire population," another defense witness testified that defendants have regularly granted certain prisoners in the BAU more benefits, including jobs and television and radio receivers, than other prisoners in the BAU. We note also that plaintiff seeks privileges or opportunities which are not generally enjoyed by prisoners in the general population. We find that defendants' argument concerning prisoner resentment is speculative, and that to the extent that disparate treatment of prisoner resentment is exaggerated response to any security problems that may exist.

Finally, defendants argue that their refusal to furnish the plaintiff's cell with a chair is justified by the security consideration that he might dismantle the chair and use it as a weapon. While this reasoning would be persuasive as applied to inmates who are confined in the BAU because they pose security risks themselves, it is inapplicable to plaintiff. As we have noted above, defendants have never asserted that plaintiff is a security risk himself. Indeed, they have provided him with a sledge hammer

---

mer and other heavy tools for use in his former job in the BAU. Consequently, we find that the denial to plaintiff of a chair in his cell is not an exaggerated response to any perceived security problem.

III. Discussion

Our analysis begins, as it must, with the recent opinion of the United States Supreme Court in Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In Wolfish, the Court considered a challenge to the conditions of confinement of pretrial detainees at the Metropolitan Correctional Center (MCC), a federal facility in New York City. Much of the Court's reasoning is expressly made applicable to convicted inmates as well as to pretrial detainees. 441 U.S. at 546 n.28 & 547 n.29, 99 S.Ct. at 1878 n.28 & n.29. The Supreme Court indicated that courts should accord great deference to correctional officials' decisions about the security needs of their institutions, and enunciated a standard for judicial review of such decisions:

Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

441 U.S. at 547–48, 99 S.Ct. at 1878–79 (emphasis added) (citations and footnotes omitted). In evaluating challenged conditions at MCC against a background of security considerations, the Court determined that the record would not support an inference that MCC officials had exaggerated their responses to security problems. 441 U.S. at 551 & 555, 99 S.Ct. at 1880 & 1882. The Court "simply have not met their heavy

11. We note also that the Supreme Court was strongly influenced in Wolfish by the fact that a large majority of the MCC detainees were incarcerated there for less than 60 days, 441 U.S. at 543 & 552 & 555 n.3, 99 S.Ct. at 1878 & 1881 & 1882 n.3 & 1886. Here, in contrast, the plaintiff has been sentenced to a minimum term of forty years.

12. Plaintiff also argues that he has been deprived of equal protection of the laws. With respect to the denial of access to religious services and to the library, he argues that he is deprived of fundamental rights in the absence of a compelling state interest. With respect to all other disparities between his opportunities

---

burden of showing that these officials have exaggerated their response to the genuine security considerations that actuated these restrictions and practices." 441 U.S. at 561–62, 99 S.Ct. at 1886. In view of this fact, we concluded that plaintiff had met this burden with respect to several of the practices which he challenges here.[11]

[3] However, such a conclusion does not resolve the matter, for in order to be entitled to relief in this action brought under 42 U.S.C. § 1983, plaintiff must establish that he has been deprived of a right secured to him by the Constitution and laws of the United States. See, e.g., Basista v. Weir, 340 F.2d 74 (3d Cir. 1965). Plaintiff in fact has been deprived of constitutional rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution. He claims that denial of his personal access to religious services violates his rights under the First and Fourteenth Amendments. He maintains that denial to him of employment, idle pay, participation in educational programs, and other benefits enjoyed by inmates in the general population, solely because he is confined in the BAU for his own protection, is an unconstitutional burden on his Eighth Amendment right to be protected reasonably from violence directed at him by other inmates.[12] And he advances a claim under Administrative Directive 80 of the Pennsylvania Bureau of Correction, over which we exercise pendent jurisdiction.

Our task is made somewhat easier by the apparent agreement of the parties on the

---

policy, plaintiff may receive daily visits and communion in his cell; that he will be provided with photocopies of materials from the prison law library for use in his cell; and that he may participate in educational programs by means of tutors and correspondence courses in his cell. Plaintiff denies that these arrangements have been made available to him in the past, but has indicated that he is willing to accept them in lieu of being transported under guard to the prison chapel, library, and school. We address these arrangements here, only to explain why the constitution requires no more of defendants but permits no less.

A. Denial of Personal Access to Religious Services

[4, 5] Prisoners must be afforded reasonable opportunities to exercise the religious freedom guaranteed by the First and Fourteenth Amendments. Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). In the Third Circuit, a restriction on the free exercise of religion by prisoners is deemed reasonable only if it is consistent with the maintenance of prison discipline. O'Malley v. Brierley, 477 F.2d 785 (3d Cir. 1973); X v. Brierley, 457 F.Supp. 350 (E.D.Pa.1978) (Luongo, J.). However, and those afforded to prisoners in the general population, he argues that these disparities are not rationally related to furthering a legitimate state interest. We do not reach either of these arguments. Even if plaintiff prevailed on both arguments, he would be entitled to no greater relief than we award upon our consideration of his other arguments. His fundamental rights are afforded as great protection by our examination of their constitutional sources as they would be afforded under Fourteenth Amendment equal protection analysis. His rational-relation claim is at best duplicative of his Eighth Amendment argument which we treat extensively.

**1300    480 FEDERAL SUPPLEMENT**

in determining what the least restrictive alternative is, we must defer to prison officials' evaluation of security risks unless their response is exaggerated. In *Wolfish*, the Supreme Court indicated that "even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment," 99 S.Ct. at 1878. In particular, we must defer to defendants' assessment of the security risks associated with providing guards to escort plaintiff to the main prison building, as we have explained Part II-E, *supra*. Because of these security considerations, plaintiff is not entitled to attend religious services in the prison chapel.[12]

[6] On the other hand, no substantial security considerations preclude plaintiff from receiving regular visits from a priest as chaplain and receiving communion or mass in his cell. Prisoners in segregated confinement are entitled at least to individual religious ministration in their cells. E. g., *Sweet v. South Carolina Department of Corrections*, 529 F.2d 854 (4th Cir. 1975) (en banc); *Diamond v. Thompson*, 364 F.Supp. 659 (M.D.Ala.1973), aff'd, 523 F.2d 1201 (5th Cir. 1975). Since defendants have asserted no legal assistance provided by inmates who ...

In *St. Claire v. Cuyler*, 481 F.Supp. 732 at 729-741 (E.D.Pa.1979), Chief Judge Lord held that the Graterford rule prohibiting chapel attendance by all prisoners housed in segregated units is invalid. He ordered prison authorities to permit the plaintiff Frank "X" St. Claire to attend religious services "unless it is determined after full hearing, followed by appropriate findings of fact, that the plaintiff's attendance at religious services constitutes a threat to prison discipline or the prison population." Id. Order I.4. He instructed the prison authorities to undertake a two-tier analysis. "First, assess whether a particular inmate is unruly or likely to cause security problems by his presence at chapel; then, if necessary, structure a staggered or rotating attendance schedule that would incorporate both the requirements of the inmates and the payment-of-personnel concerns of the administration." Id. at 741. Chief Judge Lord noted that the record was insufficient to show that St. Claire's attendance at chapel would raise bona fide security problems ...

curity considerations. Id. at 740. He cited with approval a line of cases holding that it is constitutionally valid to restrict the attendance of segregated inmates whose attendance would create security problems. Id. at 740. Here, as in the cases at bar, defendants have shown that Wojtczak's attendance at chapel implicates genuine considerations of security. Because he is plaintiff's attendance at chapel because he is in objective danger of assault, Wojtczak cannot safely attend religious services with any other prisoners unless accompanied by a two-guard escort. As we have found, providing that escort would diminish the security of the institution, and opening the BAU to transport plaintiff to the main building would diminish BAU building security. Moreover, a staggered or rotating attendance schedule would be of no avail to Wojtczak because he is in danger wherever he is accessible to other inmates. Thus our decision is consistent with that of St. Claire; in this opinion we should permit plaintiff, if necessary, exempt Wojtczak from any administrative review procedure which they institute as a result of St. Claire.

---

**WOJCZAK v. CUTLER    1301**
*Cite as 480 F.Supp. 1288 (1979)*

no security justification for limiting the frequency of plaintiff's religious exercise, they must permit him to see a chaplain of the Roman Catholic faith at least as frequently as prisoners in the general population, are permitted to attend religious services.

**B. Denial of Personal Access to the Law Library**

[7] In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828, 97 S.Ct. at 1498. See also *Bryan v. Werner*, 516 F.2d 233 (3d Cir. 1975); *Wade v. Kane*, 448 F.Supp. 678 (E.D. Pa.1978) (Lord, C.J.), aff'd, 591 F.2d 1338 (3d Cir. 1979). The Supreme Court emphasized, however, that its decision "does not foreclose alternative means" of assuring meaningful access to the courts. 430 U.S. at 830, 97 S.Ct. 1491. The Court observed, for instance, that the constitutional requirement might be met through a program of legal assistance provided by inmates who ...

were trained as paralegal assistants working under a lawyer's supervision." Id. 97 S.Ct. 1491.

While the Supreme Court has "consistently required States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts," id. at 824, 97 S.Ct. at 1496, and this right was not before the Court in *Wolfish*, *supra*, in the wake of that decision we must extend some deference to the judgments of prison officials as to the security concerns that would be implicated if plaintiff were permitted to go the law library under escort. See also *Procunier v. Martinez*, 416 U.S. 396, 420, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974). The security risks involved here are the same that preclude plaintiff's personal attendance at the prison chapel. Accordingly, we follow our earlier reasoning and hold that plaintiff need not be afforded personal access to the library. In such circumstances, other courts have held that the constitutional right of meaningful access to the courts is satisfied by providing legal materials to prisoners in their cells. *Ardberry v. Stekloff*, 586 F.2d 37 44 (7th Cir. 1978); *Frazier v. Ward*, 426 F.Supp. 1354, 1371 (S.D.N.Y.1977). We agree.

In *Bryan v. Werner*, supra, the Third Circuit held that a regulation prohibiting an inmate-run clinic from assisting inmates in filing certain suits violated their right of access to the courts in the absence of reasonable alternatives for obtaining access. The court stated, "If there is no alternative and readily available means of obtaining assistance of at least equal caliber, the restriction must be invalidated." 516 F.2d at 297. While the defendants may provide legal materials to plaintiff in his cell, this legal assistance must not be the legal research which is thereby afforded him but must be at least the equivalent of the legal research which is available to an inmate who is permitted to go personally to the prison law library. We therefore hold that his legal materials provided to plaintiff in his cell are accessible to other inmates.[14]

**C. Denial of Employment and Idle Pay**

[8] As we have found, plaintiff has been denied the opportunity to engage in remunerative employment or, when work is not available, to receive idle pay. Defendants provided plaintiff with a job immediately before the trial of this action began, but have made no representations to him or to us that they will continue to employ him or to grant him idle pay. Defendants pay idle pay to inmates who are in the BAU for reasons other than their own protection; they deny idle pay only to inmates who are in the BAU because they need protection from other prisoners.

Administrative Directive 801 of the Pennsylvania Bureau of Correction includes provisions governing the treatment of prisoners who are assigned to restricted housing units such as the BAU. The Directive provides:

The inmates [in the BAU] shall have all the rights and privileges accorded to the general prison population except for freedom to move about the institution, freedom to engage in programs with the general population, the use of civilian clothing, and the use of items specifically found by the Program Review Committee to be a security hazard.

Administrative Directive 801, Part VI.A.2 (effective October 1, 1978). The denial to plaintiff of the opportunity to work or to receive idle pay, when those benefits are afforded to prisoners in the general population, is contrary to the plain language and ...

14. In *Wade v. Kane*, supra, Chief Judge Lord found the Graterford law library constitutionally deficient because it lacked essential law books. If this situation has not been rectified, plaintiff's access to legal materials may not satisfy the constitutional minimum. In that case, he may apply for modification of our order to permit him to meet with members of the paraprofessional inmate-run law clinic in his cell.

Case 3:02-cv-01621-SRU Document 302-2 Filed 12/1/2004 Page 97 of 100

the facially apparent meaning of this provision.

Although we deal here with a state law claim, we must nevertheless apply to this situation the overriding principles of *Bell v. Wolfish, supra.* The policy of judicial deference to prison administrators stated in *Bell* is based on a recognition of the "increasingly urgent problems 'to deal with the increasingly urgent problems of prison administration and reform.'" 441 U.S. at 548 n.30, 99 S.Ct. at 1879 n.30. Accordingly, we must defer to the judgments of the Graterford administrators, no matter where they are or when scrutiny is founded on federal or state administrators. Where scrutiny is exagerated.

We note initially that no security justification has been advanced for denying plaintiff idle pay when he is not working. The only reason defendants have advanced for denying him idle pay when he is not working is uncertain what risks to security may exist, we hold only that plaintiff must be provided with remunerative employment when suitable employment is available, consistent with security precautions, and that plaintiff must be given idle pay when he is not working.

D. *Denial of Other Benefits (The Unconstitutional Conditions Claim)*

In addition to the denial of personal access to communal religious services and to the law library, and the denial of employment and idle pay, plaintiff complains that "the right of a prisoner to be reasonably free from an atmosphere conducive of sexual assault is a constitutional right; it falls within the Eighth Amendment right against cruel and unusual punishment." *United States ex rel. Ricketts v. Lightcap,* 567 F.2d 1226, 1235 (3d Cir. 1977) (concur-

*Bolish, supra.* to prison administrators stated in *Bell* is based on a recognition of the... Also, we must defer to... The policy of judicial deference is founded... *Procunier v. Martinez,* 415 U.S. 396, 404–405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Since that policy arises from these broad prudential considerations, it should be applied upon to scrutinize the decisions of prison administrators, no matter whether that scrutiny is founded on federal or state law. Accordingly, we must defer to the judgments of the Graterford authorities concerning any applicable security problems unless we find that their response is exaggerated.

The assignment of plaintiff to work outside the BAU would implicate the security considerations related to taxing the guard force and weakening the building security which we have already held preclude plaintiff's personal access to the law library and to religious services. We note, too, that Administrative Directive 801 permits limitations on plaintiff's "freedom to work outside the institution," and thus does not require that he be assigned to work outside the BAU. For these reasons, we do not order defendants to assign plaintiff to work within the BAU building when such employment is available. The record has not been developed with respect to security risks involved in assigning plaintiff work inside the BAU. It is clear, however, that no security considerations preclude plaintiff from ever being assigned remunerative work, since he was given work shortly before the first hearing in this action. Because we are uncertain what risks to security may exist, we hold only that plaintiff must be provided with remunerative employment when suitable employment is available, consistent with security precautions, and that plaintiff must be given idle pay when he is not working.

the general population at Graterford. In particular, he complains of disparities in the availability of educational programs, in cell furnishings, in time out of the cell, in the frequency of opportunities to shower and shave, and in the hours of visitation. We have already made factual findings with respect to these disparities.

We emphasize that plaintiff does not argue, and we do not hold, that the limited rights and privileges afforded him in themselves constitute cruel and unusual punishment. Such an argument or holding would be contrary to the clear weight of precedent. See, e. g., *Newman v. Alabama,* 559 F.2d 283, 291 (5th Cir. 1977), cert. denied, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Gregory v. Wyse,* 512 F.2d 411 (1st Cir. 1975). See also *Nadeau v. Helgemoe,* 561 F.2d 411 (1st Cir. 1977). However, we recognize that even prisoners in the general population must be given idle pay when he is not working. Put differently, we conclude that, absent valid security considerations, plaintiff may not be required to renounce his right to reasonable protection from other inmates as a condition of receiving the opportunities afforded to prisoners in the general population.[16]

I. *The Eighth Amendment Right to Protection from Other Inmates*

[9] Our analysis proceeds from the proposition that correctional authorities have an obligation to protect inmates from violence and assaults directed at them by other inmates. Judge Van Dusen has explained that "the right of a prisoner to be reasonably free from an atmosphere conducive of sexual assault is a constitutional right; it falls within the Eighth Amendment right against cruel and unusual punishment." *United States ex rel. Ricketts v. Lightcap,* 567 F.2d 1226, 1235 (3d Cir. 1977) (concurring opinion). Moreover, in *Woodhous v. Virginia,* 487 F.2d 889, 890 (4th Cir. 1973) the Fourth Circuit held:

> A prisoner has a right, secured by the eighth and fourteenth amendments, to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates, and he need not wait until he is actually assaulted to obtain relief.

Accord, *Rudolph v. Locke,* 594 F.2d 1076 (5th Cir. 1979); *Little v. Walker,* 552 F.2d 193 (7th Cir. 1977), cert. denied, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978); *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 858 n.3 (4th Cir. 1975) (en banc); *Finney v. Arkansas Board of Corrections,* 505 F.2d 194, 201 (8th Cir. 1974); *Stevens v. County of Dutchess,* 445 F.Supp. 89 (S.D.N.Y.1977). The danger of assault may be proved by evidence of events at other penal institutions in the area, as well as at the institution at which the prisoner is serving his sentence. *Withers v. Levine,* 449 F.Supp. 473, 476 (D.Md. 1978).

*The Eighth Amendment and the Doctrine of Unconstitutional Conditions*

[10] The defendants have accommodated Wojtczak's well-founded apprehension of harm by housing him in the BAU. His assignment to the BAU was made after a hearing at which he expressed his well-grounded fear of assault. We cannot say that by assigning Wojtczak to the BAU defendants have failed to satisfy their duty of reasonable care to protect him from violence. However, as a condition of receiving this protection, the defendants have deprived Wojtczak of some rights and privileges which would have been available to him if he had remained in the general population. Defendants argue that by requesting voluntary confinement in the BAU, the plaintiff has waived the rights and privileges granted to prisoners in the general population. Although plaintiff does request continued confinement in the BAU for his own

[16] Our reasoning in this section is also applicable to plaintiff's claims for remunerative employment and idle pay and constitutes in alternate holding with respect to them, although we have disposed of those claims on the basis of state law.

protection, we believe that, under the facts of this case, defendants' waiver argument is unsound. Defendants' would condition the plaintiff's enjoyment of the opportunities available to prisoners in the general population on his willingness to be reassigned to the general population. Thus defendants would require plaintiff to choose between those opportunities and his constitutional right to be protected reasonably from harm by other inmates.

... short of it is that defendants would ... the opportunity to participate in educational programs, to have a chair in his cell, and otherwise to receive treatment equivalent to that afforded prisoners in the general population, because he has transgressed Eighth Amendment rights. This is impermissible. In *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Supreme Court analyzed a similar denial of benefits as follows:

For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. Such interference with constitutional rights is impermissible.

408 U.S. at 597, 92 S.Ct. at 2697. Accord, *Elrod v. Burns,* 427 U.S. 347, 358–61, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); *Frost[i] v. Rizzo,* 597 F.2d 840, 846 (3d Cir.), cert. denied, — U.S. —, 100 S.Ct. 82, 62 L.Ed.2d 52 (1979).

In fact, the antecedent of the doctrine of unconstitutional conditions are far older than the quasi-contract claimed by the *Perry* Court. In *Insurance Company v. Morse,* 87 U.S. (20 Wall.) 445, 22 L.Ed. 365 (1874), the Court invalidated a Wisconsin statute which permitted foreign corporations to do business in Wisconsin only on the condition that they waive their right to remove suits filed against them in the state courts to federal court. The Court held that although the state could absolutely prohibit a foreign corporation from doing business in Wisconsin, it could not impose conditions "which are repugnant to the Constitution and laws of the United States." *Id.* at 456–57. The Wisconsin statute was unconstitutional because it obstructed the petitioner in the exercise of his rights under Article III of the Constitution and the Judiciary Act of 1789. In *Frost v. Railroad Commission,* 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1926), the Court traced the development of the doctrine during the preceding half-century, concluding:

If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guarantee embedded in the Constitution of the United States may thus be manipulated out of existence.

271 U.S. at 594, 46 S.Ct. at 607. See generally L. Tribe, *American Constitutional Law* 510 (1978); Van Alstyne, *The Demise of the Right—Privilege Distinction in Constitutional Law,* 81 Harv.L.Rev. 1439, 1445–49 (1968); O'Neil, *Unconstitutional Conditions: Welfare Benefits with Strings Attached,* 54 Cal.L.Rev. 443 (1966); Note, *Unconstitutional Conditions,* 73 Harv.L.Rev. 1595 (1960); Hale, *Unconstitutional Conditions and Constitutional Rights,* 35 Colum.L.Rev. 321 (1935); Merrill, *Unconstitutional Conditions,* 77 U.Pa.L.Rev. 879 (1929).

The doctrine of unconstitutional conditions has been applied most frequently in recent years to protect First Amendment

rights.[17] For example, in *Perry v. Sindermann, supra,* an untenured college professor challenging the nonrenewal of his employment contract with a state college. He alleged that the decision not to rehire him was based on his public criticism of college policies. The Supreme Court held that his continued employment could not be conditioned on the surrender of the right to freedom of speech. *Perry* is but one in a long line of cases in which the First Amendment protected public employees from discharge for reasons that infringe their rights to freedom of speech. E.g. *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In *Frost, supra,* we held that a system of political patronage dismissals of public employees unconstitutionally conditioned their employment on the nonassertion of their rights to freedom of association and belief. 427 U.S. at 356–61, 96 S.Ct. 2673 (plurality opinion); *id.* at 375, 96 S.Ct. 2673 (concurring opinion).

The Supreme Court has also applied the doctrine of unconstitutional conditions to protect First Amendment interests in the free exercise of religion. In *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Court held that South Carolina could not constitutionally deny unemployment benefits to a claimant who refused to work on Saturday because of her religious beliefs. The Court commented, "It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." 374 U.S. at 404, 83 S.Ct. at 1794. And in *McDaniel v. Paty,* 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978), the Court invalidated a Tennessee statute which disqualified members of the clergy from running for election as delegates to the state's con

stitutional convention. The Court held that the clergy disqualification provision unconstitutionally burdened access to the minister, imposing ... on the minister-candidate's willingness to surrender his religiously-implied ministry. 435 U.S. at 626, 98 S.Ct. 1322 (plurality opinion); *id.* at 633, 98 S.Ct. 1329 (concurring opinion).

However, the doctrine has never been restricted to cases where First Amendment interests were implicated. Its origins in the doctrine lie elsewhere, see, e.g. *Frost, supra,* and the doctrine has consistently been employed to protect other constitutional interests. For example, in *Dixon v. Alabama State Board of Education,* 294 F.2d 150 (5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), the court held that due process requires notice and hearing before students at a tax-supported college are expelled for misconduct. Rejecting appellant's argument that the students had waived notice and a hearing by accepting the privilege of state college enrollment, the court of appeals commented that "the State cannot condition the granting of even a privilege upon the renunciation of the constitutional right to procedural due process." 294 F.2d at 156. In *Perry*

17. "[I]t seems to be settled, at least in the First Amendment area, that the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected inter-... *Frost[i] v. Rizzo, supra,* 597 F.2d at 845.

Case 1:01-cv-01163-SHR    Document 30-2    Filed 01/21/2004    Page 99 of 100

warrantless searches was unconstitutional, because the agency could not condition continued receipt of welfare benefits upon a waiver of Fourth Amendment rights. 57 Cal.Rptr. at 630–31, 425 P.2d at 230–31.

While the doctrine of unconstitutional conditions has not previously been applied to protect the Eighth Amendment interests of a convicted prisoner, we can discern no reason of logic or of policy for declining to invoke it to safeguard the First Amendment interests of a prison inmate. Most important, the logical foundation of the unconstitutional conditions doctrine applies with equal force in any case in which the enjoyment of a government-sponsored benefit is conditioned upon a person's nonassertion of any constitutional right. See Van Alstyne, supra, 81 Harv.L.Rev. at 1445.

We do note one difference between application of the doctrine here and its application in other contexts. The pertinence of the unconstitutional conditions doctrine here depends upon our prior factual finding that the plaintiff is objectively in danger of violent assault. This logical dependency is a consequence of the special nature of the Eighth Amendment right to protection from other inmates. The constitutional rights of freedom of speech, free exercise of religion, and freedom from unreasonable warrantless searches are guaranteed to all person at all times, although of course the contours of the rights may vary from situation to situation: Governmental authorities are always under an obligation to refrain from any activity that would infringe these rights. In contrast, the Eighth Amendment right to protection from other inmates does not place any obligation upon prison authorities except when the objective possibility of assault exists. Therefore, the right is not implicated when the government denies to a prisoner unless the prisoner is himself in danger. In a legal action brought by a prisoner, the burden of showing that he is objectively in danger is of course on the plaintiff.

### 3. Security Considerations

Given the overriding character of *Bell v. Wolfish*, we must defer to the judgments of prison authorities concerning security considerations unless their response is exaggerated. Since the defendants have advanced different security justifications for each of plaintiff's

In this respect, the Eighth Amendment right is like the procedural due process right in *Dixon, supra*, since procedural due process does not place any obligation on governmental authorities unless a person is deprived of a cognizable liberty or property interest. See, e. g., *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Like procedural due process, the right to protection from other inmates only comes into play in a specific factual context. In the case of procedural due process, the requisite fact is the pending deprivation of a liberty or a property interest. In the case of the right to protection, the requisite fact is that an inmate is objectively in danger of violent assault. We have previously found that the present plaintiff is objectively in danger of violence directed at him by other inmates, thus triggering the unconstitutional conditions doctrine.

[11, 12] With the foregoing caveat, we hold that prison authorities may not condition the rights, privileges, or opportunities of a prisoner who is objectively in danger of violent assault upon his renunciation of his Eighth Amendment right to be protected reasonably from violence directed at him by other inmates, except to the extent the *Wolfish* grounded security considerations allow. Here the defendants have confined plaintiff to the BAU for his own protection, and as a condition of this protection, have required him to forego education and other benefits. For the reasons and subject to the limitations stated in the preceding discussion, defendants may not deny plaintiff those benefits on a basis that infringes his Eighth Amendment right to protection. We turn then to the questions of security considerations.

#### b. Cell Furniture

The denial to plaintiff of a chair in his cell is plainly an exaggerated response to security considerations which are relevant only to prisoners who are housed in the BAU for reasons other than self-protection. As has already been noted, the only justification asserted by the defendants is that a chair might be dismantled and used as a weapon. However, they have not tried to show that plaintiff himself presents a security risk, and in fact they provided him with use in his former employment within BAU.

#### c. Visitation, Personal Hygiene, and Time Out of the Cell

[13, 14] With respect to visitation, we find that the disparity between plaintiff's privileges and those of prisoners in the general population is insubstantial. Plaintiff is allowed the same number of visits as other prisoners, but is allowed fewer hours during which visits may be scheduled. The scheduling of visits is within prison officials' discretion. *Bell v. Procunier*, 417 U.S. 817, 92 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Further-

privileges and those of prisoners in the general population, we examine the offered justifications separately and in turn.

#### a. Educational Programs

The security considerations that are relevant to restrictions on plaintiff's access to educational programs in the main prison building are the burden on the guard force which would be created by supplying plaintiff the necessary two-guard escort, and the dimunition in BAU building security arising from the frequent transport of plaintiff to the prison school. See pp. 1297–1298, supra. For these reasons, we hold that plaintiff is not entitled to attend classes in the main prison building, but must be permitted instruction by tutors and the use of educational materials in his cell.

Conflicting evidence was presented on the question of how many guards are required to take plaintiff to the shower. No evidence was presented on the question of possible burdens on the guard force that would result from permitting plaintiff to remain out of his cell for more than one hour per day. We cannot hold that neither of these matters can we conclude that plaintiff has met his burden of proof by showing that the response of prison officials to security concerns was exaggerated. Accordingly, plaintiff's claims for relief related to these issues are denied.

An appropriate order follows.[18]

---



**MEINEKE DISCOUNT MUFFLER SHOPS, INC., Plaintiff,**

**v.**

**Joseph FELDMAN, Esther Feldman, Nathan Shanak and Robert Benjamin, Defendants.**

**Civ. A. No. H-79-860.**

**United States District Court, S. D. Texas, Houston Division.**

**Dec. 7, 1979.**

Franchisor brought action against franchisee and others to recover for breach of the franchise agreement. On defendants' motions to dismiss or transfer, the District Court, Sterling, J., held that: (1) court

---

18. Our order is directed at Superintendent Carter alone because he possesses the authority to comply with our order; we do not mean to suggest, however, that the other defendants are not also subject to our order. Indeed no evidence was presented at trial against most of the other defendants and we know of no way of knowing what relief, if any, to require from them.

(6)

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

Commonwealth of Pennsylvania
Department of Corrections

INSTRUCTIONS
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

Tom Gembuski    NHC

1. To: (Name and Title of Officer)

Richard Wojtczak AF5977

3. By: (Print Inmate Name and Number)

_Inmate Signature_

2. Date: 7-27-2001

4. Counselor's Name    Leighty

5. Unit Manager's Name    Walters

6. Work Assignment
medically unable to work

7. Housing Assignment
BA 1040 cell

8. Subject: State your request completely but briefly. Give details.

Tom,

I writing to you now before it happens, I have a very serious concern, extreme concern, with ALL this 'going back and forth' with Donald Williamson of the DOC, this 'VOTE SHEET' approved or denial of my Transfer to SRCF Mercer; with the ever present delayed process 'attitude' of the problems that I have experienced, undergone here at SCI Huntingdon, with the Pa DOC, also SCI Huntingdon for the past 2½ years!

I am extremely concerned that I am going to recieve one of the 'trifling Misconducts' that SCI Huntingdon is so famous for. This misconduct will then make me a Level 4! NO Transfer to a minimum security facility!

It will take me 'forever' to reach Level 2 again, IF EVER!!

I don't know what to do, or how to handle this situation ???

Thank you

9. Response: (This Section for Staff Response Only)

Misconduct A 472303 is dated 10-18-01

They couldn't find anything FACTUAL to write me up

so they just Made something Up!!! Just to get my Level 2 status Taken away!!!

Typical Dept of Corrections!!

To DC-14 CAR only ☐    "Correctional Professionals"    To DC-14 CAR and DC-15 IRS ☐

Staff Member Name _____    Date _____
                    Print              Sign

Revised July 2000